FELDMAN, Justice.
Petitioner, the defendant below (defendant), brings this special action to contest his conviction under A.R.S. § 28-692(B) for driving “while there is 0.10 per cent or more by weight of alcohol in the ... blood.” Defendant argued that we should accept jurisdiction because he has no remedy by appeal from the superior court for most of the issues argued below (see A.R.S. § 22-371 and Baca v. Don, 130 Ariz. 222, 635 P.2d 510 (App.1981)) and construction of the new drunk-driving law is a matter of statewide concern. The amici claim that the issues presented are matters of nationwide interest. We have accepted jurisdiction because we find the remedy by appeal inadequate and because we believe the case does present matters of public concern and importance; speedy decision will serve the public interest. See King v. Superior Court, 138 Ariz. 147, 673 P.2d 787, 790 n. 3 (1983). We have jurisdiction under Rule 8, Rules of Procedure for Special Actions, 17A A.R.S., and Ariz. Const, art. 6, § 5(3).
On September 29, 1982, defendant was stopped while driving in the City of Tempe by a police officer who noticed his registration tags had expired. While talking to defendant, the officer detected the smell of alcohol and gave defendant field sobriety tests. Defendant’s performance was unsatisfactory. He was arrested and booked for driving while under the influence. The booking procedure, which was videotaped, included administration of an intoxilyzer test. Defendant’s blood-alcohol concentration (BAC) tested at .11% indicating a volume of u/ioo of one percent of alcohol in defendant’s blood.
The new drunk-driving law (A.R.S. § 28-692) passed by the Arizona State Legislature went into effect in July 1982. Insofar as is relevant to this case, it provides as follows:
A. It is unlawful and punishable as provided in § 28-692.01 for any person who is under the influence of intoxicating liquor to drive or be in actual physical control of any vehicle____
B. It is unlawful and punishable ... for any person to drive or be in actual physical control of any vehicle ... while there is 0.10 per cent or more by weight of alcohol in the person’s blood.
Defendant was charged with violating subsection B; he was not charged with a violation of subsection A. Prior to trial, defendant moved to suppress all evidence relating to the results of the field sobriety tests, the opinions of the officers that defendant appeared intoxicated, the videotape of defendant’s conduct during the booking procedure, and all other “non-chemical” evidence. The motion was denied and much of that evidence was admitted at defendant’s trial. Also admitted, over objection for lack of foundation, was evidence of the intoxilyzer test results. Defendant produced expert testimony from a professor of analytical chemistry that intoxilyzer results are subject to three distinct types of error. The first is a margin of error of ± 10% (0.01% BAC) resulting from problems inherent in calibration of the equipment and administration of the tests. The second is a margin of error of up to 30% resulting from the adoption of a standard blood-alcohol conversion ratio. It is necessary to apply a ratio to convert the intoxilyzer result (which measures the amount of alcohol in the breath of the test subject) to a figure representing the concentration of alcohol in the subject’s blood. The chemist testified that the intoxilyzer test used on defendant assumes a standard conversion ratio which represents a mean or average, while the actual figure varies by as much as 30% from individual to individual. The third type of error to which the process is susceptible is the variable rate of absorption of alcohol into the bloodstream. The speed at which the body absorbs alcohol is affected by the presence or absence of food in the stomach. When the stomach is empty of food, alcohol is absorbed much more quickly. The test can only measure the amount of alcohol in the blood at the time of the *594 test, not at the time of the event. If a person has had several drinks during dinner, is arrested while driving soon afterward, and given an intoxilyzer test an hour or two later, the test is likely to show a considerably greater BAC than that which existed at the time of arrest.[1] Based upon this testimony, the defense argued that a violation of § 28-692(B) could not be established beyond a reasonable doubt.
After six minutes of deliberation, the jury returned a verdict of guilty. Defendant was sentenced and appealed to the superior court. The conviction and sentence were affirmed by that court, and defendant then sought review by special action.
Defendant attacks his conviction on three theories. He claims, first, that the statute is fundamentally unconstitutional. Next, he argues that the court committed error in admitting evidence that he was “under the influence” when he was charged only with a violation of subsection B for having a BAC of .10% or more. Finally, defendant claims that the trial judge erred in admitting the intoxilyzer test results without the foundation required by statute and regulation.
CONSTITUTIONALITY OF THE STATUTE
Defendant makes multiple constitutional attacks on the statute. Many of these issues were not raised in the trial court. We have discretion to consider constitutional attacks for the first time on appeal because defendant claims the statute under which he was prosecuted is void. See State v. Junkin, 123 Ariz. 288, 290, 599 P.2d 244, 246 (App.1979). We may appropriately exercise that discretion where, as in the case at bench, the issues involve public policy or are of broad general or statewide concern. Id. We note further that the constitutional issues have been thoroughly briefed in the amici briefs filed by the prosecutor for the City óf Phoenix, arguing that the statute is constitutional, and by the public defenders for the cities of Mesa and Scottsdale, who argue the contrary. We conclude, therefore, that it is appropriate to consider all of the constitutional issues raised on appeal.
Defendant and the public defenders claim the statute is unconstitutional and void for vagueness and a variety of other reasons. A similar contention was recently considered by a California court of appeals in People v. Alfaro, 143 Cal.App.3d 528, 192 Cal.Rptr. 178 (1983). Distinguishing the cases in which chemical test results provide only a presumption that the defendant was “under the influence,” the court correctly noted that the California statute established a separate criminal offense which, for conviction, requires only proof of a particular blood-alcohol level.[2] Id. at 533, 192 Cal.Rptr. at 182. A majority of the California court held that the statute was vague and therefore violated the due process clause. The court based its decision on the principle that statutes “must be definite enough to provide a standard of conduct for those whose activities are proscribed.” Id. at 531, 192 Cal.Rptr. at 180.
The California court acknowledged that the majority rule holds similar statutes constitutional in the face of various constitutional challenges. See, e.g., State v. Franco, 96 Wash.2d 816, 639 P.2d 1320, 1324-25 (1982); State v. Hamza, 342 So.2d 80 (Fla.1977); Coxe v. State, 281 A.2d 606, 607 (Del.1971); Greaves v. State, 528 P.2d 805, 808 (Utah 1974); State v. Ball, 264 S.E.2d 844, 845 (W.Va.1980). Other cases, not cited in Alfaro, which hold the statute consti *595 tutional include Morgan v. Municipality of Anchorage, 643 P.2d 691 (Alaska App.1982) and State v. Thompson, 138 Ariz. 341, 674 P.2d 895 (App.1983).
The Alfaro court dismisses the authorities it cites, and the majority rule in general, with the comment that they “do not in our view forthrightly address the problem of notice and consequently are of scant assistance in the present analysis.” People v. Alfaro, 143 Cal.App.3d at 534, 192 Cal.Rptr. at 182. The defendant and the public defenders amici argue that the cases upholding constitutionality of the statute against the vagueness attack are based on incorrect factual and scientific assumptions. These amici also claim that the cases fail to consider procedures, supposedly mandated by the statute, which violate numerous constitutional provisions. We address these constitutional challenges first.
Substantive Due Process and Equal Protection
The first argument is that the statute infringes on fundamentally protected rights, such as the right to travel and the right to maintain a driver’s license, and cannot withstand attack under the due process or equal protection clauses unless such regulation is necessary to promote a compelling state interest. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Legislative classifications bearing on fundamental rights are to be strictly scrutinized and held unconstitutional absent a compelling governmental justification. L. Tribe, American Constitutional Law § 16-7, at 1002 (1978). Assuming, without deciding, that the rights affected are fundamental, we believe the statute meets the test. We have previously remarked upon the compelling state interest in reducing the terrible toll of life and limb on our highways. Ontiveros v. Borak, 136 Ariz. 500, 507, 667 P.2d 200, 207 (1983). Stringent laws such as that in question are designed to end the lethal combination of alcohol and automobile. The constitutional requirements are met and explained by the very scientific evidence which the public defenders amici present in the appendix to their brief. It seems to be the general consensus of scientific thought that almost every driver will experience significant impairment of driving ability at a BAC level of .05% to .08%. Thus, in declaring driving or control of a vehicle illegal at .10%, the legislature has proscribed driving at a level where virtually every driver would be a danger to the public. Keeping such drivers off the road is certainly necessary to the state’s interest. We believe the end sought by the legislature is compelling and the method adopted is necessary.
Due Process — Presumption
It is next argued that the statute is void because it creates a presumption of guilt. Our court of appeals correctly dismissed the presumption argument raised in State v. Thompson, supra, by pointing out that the statute contains no presumption but, rather, an outright ban on driving with a .10% BAC. The public defenders amici argue that the court failed to consider the true implications of the presumption argument. They concede that the statute is “per se” in nature and creates no presumption; they argue that the admission of test results which may be scientifically inaccurate subjects a defendant to “conviction by machine” despite the fact that the test results do not necessarily indicate the true blood-alcohol level of the test subject.[3] The amici contend that allowing a finding of guilt beyond a reasonable doubt on the basis of test results which, according to the weight of scientific evidence, are subject to considerable inaccuracy, violates the rule of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Sandstrom holds that irrebuttable presumptions of guilt violate the fourteenth amendment’s *596 requirement that the state prove every element of a crime beyond a reasonable doubt.
We agree that neither State v. Franco, supra; State v. Thompson, supra, nor the other cases in the majority have considered this type of presumption argument. Given the inherent possibility of error in the test results, the argument has some plausibility. However, we need not decide whether such a rule would violate Sandstrom v. Montana, because we hold, infra at 129, that the defendant may attack the accuracy of the test on any relevant ground, including inherent margin of error. Conviction is possible only when the jury finds beyond a reasonable doubt that the defendant’s blood-alcohol level at the time of driving or controlling the vehicle was .10% or more, not simply on the basis that the test results were .10% or greater.
Further constitutional challenges are made, such as deprivation of trial by jury (“substitution” of a machine test result for a jury verdict), shifting of the burden of proof and deprivation of the sixth amendment right of confrontation. However, as amici acknowledge in their brief, these challenges must fail if, as we hold below, defendant is given the right to challenge the accuracy of the test results and if the jury is permitted to consider those results, and all other evidence submitted, in determining whether the state has proved beyond a reasonable doubt that the defendant violated the statute. Again, that statute proscribes driving or controlling a vehicle with a blood-alcohol level of .10% or more, not driving or controlling a vehicle when a test shows a level of .10% or more.
Due Process — Vagueness
We return, thus, to the major constitutional attack, the question of vagueness. The essence of the argument advanced is contained in the following language from Alfaro:
[W]e deal with a law which allows persons to drink and drive, but gives no reasonably ascertainable means of knowing when such conduct becomes “criminal.”
Examples of how the “(b)” section might operate in a grossly unfair manner come easily to mind. Posit any law abiding citizen who, reasonably and correctly believing his driving ability to be unimpaired and his blood alcohol level to be below 0.10, decides to drive home after imbibing liquor at a social function. Stopped by the police for reasons unrelated to his driving ability ... and exhibiting no objective signs of impaired ability, but conceding his use of alcohol, he may then be detained, tested, arrested and convicted because, unbeknownst to him, his blood-alcohol level had by assimilation increased — as the result of factors beyond the ken of lay persons — to a level of 0.10 during the course of his trip home.
We think that the challenged subsection will, if upheld, regularly produce convictions on such palpably unfair terms of notice, since the individual could only speculate as to how and when his blood-alcohol ratio would reach the criminal point.
Therefore, with reluctance, given the compelling pragmatic reasons underlying the Legislature’s salutary purpose in enacting [the statute], we conclude that the section is fatally vague in its notice provisions, and hence unenforceable.
People v. Alfaro, 143 Cal.App.3d at 536, 192 Cal.Rptr. at 182 (emphasis in original; footnote omitted). Defendant and the public defenders argue that the authorities supporting the constitutionality of per se statutes against the vagueness challenge do not meet the essence of the Alfaro argument. As an example, they claim that in State v. Thompson, supra, our court of appeals quoted from State v. Franco, supra, and State v. Morgan, supra, in holding that those who drink would be able to recognize the danger of imbibing more alcohol than was permitted under per se statutes and that those in doubt might refer to charts and tables, such as those published by the governor of this state, to determine how many drinks were “safe.” The defenders cite toxicological and medical opinion that the first faculty impaired by the *597 use of alcohol is the ability to recognize “how much is enough.”[4] They cite the same sources for the proposition that the charts are scientifically inaccurate because' the estimates contained in those charts fail to allow for a wide range of variables.[5]
Thus, defendant and the public defenders argue that Thompson, Franco and the other cases which uphold the per se law on the basis that the statutes give notice of the conduct which is prohibited incorrectly assume there is some way for a non-expert to determine when his BAC is about to reach the proscribed level. Citing State v. Jacobs, 119 Ariz. 30, 579 P.2d 68 (App.1978), the amici argue that a statute is void for vagueness when those who may be affected by its reach are unable to ascertain the point at which lawful conduct becomes criminal. A statement to that effect, based upon the opinion of the United States Supreme Court in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), is contained in Jacobs. Id. 119 Ariz. at 32, 579 P.2d at 70.
We think the concept expressed in Jacobs is inapplicable to the case at bench. Jacobs reflects the concern of the courts where the activities which may be inhibited by uncertainty in determining where lawful conduct becomes criminal involve fundamental constitutional rights, such as the freedom of speech or freedom to petition public officers or officials. The language quoted in Jacobs from Grayned was as follows:
Third, but related, where a vague statute “abutfs] upon sensitive areas of basic First Amendment freedoms, ” it “operates to inhibit the exercise of [those] freedoms.” Uncertain meanings inevitably lead citizens to “steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.”
Id. at 32, 579 P.2d at 70 (emphasis supplied).
No fundamental constitutional right is inhibited by the statute here under consideration. Even if we assume that a right to drive is fundamental when one can meet the qualifications set by the legislature, and assume that one of suitable age has a “right” to drink in a state which licenses and permits the sale of alcoholic beverages, the statute does not affect these rights. It does not prohibit driving. It does not prohibit drinking. It prohibits drinking and driving. We know of no constitutional right to drink and drive; we recognize no right to ingest a substantial amount of alcohol and then drive. If, therefore, this statute inhibits and “chills” the mixture of alcohol and gasoline, it will fulfill the precise objective sought by the legislature. We think such a goal is salutary, and that it is permitted by the constitution.
Thus, for statutes which do not affect basic or fundamental rights, we adopt the more “traditional” measurement of the “void for vagueness” concept.
First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.... Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.
Id., quoting from Grayned, supra.
*598 Applying the quoted tests, we disagree with the conclusion of the Alfaro court.[6] Pragmatically, there may be no way for a particular drinker to know the precise moment he reaches the physiologic point at which driving or controlling a vehicle will violate the law. We take notice, however, that it requires more than a small amount of alcohol to produce a .10% BAC.[7] Those who drink a substantial amount of alcohol within a relatively short period of time are given clear warning that to avoid possible criminal behavior they must refrain from driving.
While the driver may not be able to determine that his BAC is .10%, rather than .099%, such precision is not required to prevent the statute from being declared vague. Due process requires neither perfect notice, absolute precision nor impossible standards. It requires only that the language of a statute convey a definite warning of the proscribed conduct. Burg v. Municipal Court for the Santa Clara Judicial District of Santa Clara County, 144 Cal.App.3d 169, 192 Cal.Rptr. 531, 533 (1983). The Burg court reached a result diametrically opposed to Alfaro, supra, and upheld the constitutionality of the California per se DWI statute. Where a statute gives fair notice of what is to be avoided or punished, it should not be declared void for vagueness simply because it may be difficult for the public to determine how far they can go before they are in actual violation. Burg v. Municipal Court, supra.
Our court of appeals quoted language which, while it pertains to the “driving under the influence” section of the statute, is appropriate to the per se section:
We do not believe that a person who intentionally drinks and intentionally drives must be aware that he is under the influence of alcohol in order to be convicted ____ It does make sense to require a person who drinks and drives to be responsible for not drinking to the point where he is [in violation of the statute]. He should drive at his peril rather than only at the public’s peril.
State v. Thompson, 138 Ariz. at 344, 674 P.2d at 898, quoting from Morgan v. Municipality of Anchorage, 643 P.2d 691, 692 (Alaska App.1982). We hold that the statute is not vague.
Procedural Due Process — Enforcement
Defendant next claims the statute is unconstitutional for lack of due process because enforcement problems will result in many innocent people being found guilty. The essence of this argument is the difficulty of proof that defendant had the proscribed BAC at the time he drove or controlled the motor vehicle when the chemical test is administered some time later and is subject to the unavoidable problems discussed above. See ante at pp. 124-125. Obviously, since it is the person’s BAC at the time of driving or controlling the vehicle which determines whether the statute has been violated, results of a test administered after a significant period of time has elapsed or which are subject to other factors creating scientific inaccuracy may leave a reasonable doubt of guilt. These are evidentiary problems which are for the fact finder. See State v. Dacey, 138 Vt. 491, 418 A.2d 856, 859 (1980), holding that expert evidence relating the test result to the time of the occurrence is necessary before the state can rely on a statutory presumption.
Thus, the defendant may offer expert testimony to show that for one reason or another the test results of .10% or higher do not prove beyond a reasonable doubt that the level at the time of driving was in excess of that proscribed. At the *599 same time, the state may introduce evidence to explain the methodology and corroborate or establish the accuracy of the particular test as an indicator of alcohol level at the critical time. The question of whether the results establish that the prosecution has met its burden of proving the defendant guilty beyond a reasonable doubt is for the jury. The issue of whether the state can carry its burden of proof by merely introducing the test results without other evidence is not presented here, nor do we decide that issue. The statute is not unconstitutional for violation of due process rights merely because its enforcement will permit or require evidence of test results which, though relevant, may lack individual conclusive effect. State v. Rollins, 141 Vt. 105, 444 A.2d 884 (1982); Cooley v. Municipality of Anchorage, 649 P.2d 251 (Alaska App.1982). The question of whether the evidence as a whole satisfies the necessary standard of proof beyond a reasonable doubt is ordinarily for the jury.
ADMISSIBILITY OF EVIDENCE OF DEFENDANT’S CONDUCT AND BEHAVIOR
Defendant claims that the court erred in permitting, over appropriate objection, testimony regarding the manner in which he was driving, the manner in which he performed the field sobriety tests, and the videotape showing his behavior at the time he was booked and given the intoxilyzer test. Defendant argues that such evidence would be relevant to the question of whether a driver had violated subsection A of the statute by driving “while under the influence,” but is irrelevant to the question of whether he violated subsection B by driving with a .10% or greater BAC.
We disagree. Again, although the evidence is not conclusive, we feel it is relevant. We agree with defendant that the only ultimate issue is whether defendant had a BAC of .10% or greater. In each case in which a violation of subsection B is charged, the state will present evidence of the test and the issue will be whether the test results were an accurate measurement of the defendant’s BAC at the time of arrest. Typically, defendants will attack the margin of error, the conversion rate, the calibration of the test instrument, the technique used by the operator, the absorption and detoxification factors, etc. Evidence of defendant’s conduct and behavior — good or bad — will be relevant to the jury’s determination of whether the test results are an accurate measurement of alcohol concentration at the time of the conduct charged. For instance, the test in the case at bench was given several hours after the arrest and showed a .11% BAC. Defendant attacked the results, presenting evidence regarding margin of error, time lapse and other factors. Such evidence might raise considerable doubt whether the test result of .11% indicated .10% or greater BAC at the time defendant was arrested. Evidence that at that time the person charged smelled strongly of alcohol, was unable to stand without help, suffered from nausea, dizziness or any of the other “symptoms” of intoxication would justify an inference that a test administered some time after arrest probably produced lower readings than that which would have been produced had the test been administered at the moment of arrest. The converse is also true. Evidence that at the time of arrest defendant was in perfect control, displayed none of the symptoms of intoxication and had not driven in an erratic manner, is relevant to show that a reading of .11% from a test given some time later does not prove beyond a reasonable doubt that the defendant was driving with a .10% or greater BAC at the time of his arrest. Such evidence has been held admissible. State v. Clark, 286 Or. 33, 593 P.2d 123 (1979); Denison v. Anchorage, 630 P.2d 1001 (Alaska App.1981). Again, evidence is admissible when it is relevant. Rule 402, Ariz.R.Evid., 17A A.R.S.
Defendant next complains that the court erred in admitting, over appropriate objection, expert evidence from police officers that at the time he was arrested defendant was “drunk,” “intoxicated,” and “under the influence.” We acknowledge that for the *600 reasons described in the preceding paragraph, this evidence is also relevant. It is also an opinion of ultimate fact with regard to prosecutions under subsection A. The rules of evidence permit opinions on “ultimate issues." See Rule 704, Ariz.R.Evid. 17A A.R.S. However, Rule 403 gives the court discretion to exclude otherwise relevant evidence where its probative value is outweighed by the danger of prejudice. In a prosecution under subsection B, with no charge under subsection A, the jury might easily be misled or diverted from the only issue — the chemical level of blood-alcohol— by expert testimony containing commonly used phrases which indicate guilt of the crime not charged. Ordinarily, the probative value of such evidence in a “per se” case would be slight and the danger of prejudice great. We need not decide if the admission of this evidence was an abuse of discretion in the case at bench since we are forced to reverse on other grounds. However, we do urge trial courts to exercise a great deal of caution in the admission of opinion evidence of this type.[8]
We are aware that upholding the admissibility of evidence concerning inherent inaccuracy in the test process and evidence with regard to conduct and behavior corroborating the test results reduces the certainty of a test-based determination of guilt or innocence under subsection (B). Unavoidably in some cases in which test results are close to .10%, enforcement of the statute may resemble presumptive use of test results contrary to legislative objectives. However, we see no alternative given the scientific problems. These problems could be ameliorated and enforcement made more certain if it were possible for law enforcement officers to administer the test more promptly than was done in the case at bench.
FOUNDATION FOR ADMISSION OF TEST RESULTS
Defendant claims that the court erred in admitting the results of the intoxilyzer test over an objection for insufficient foundation. The foundational objection was based upon the lack of evidence that the Tempe Police Department Was participating in a quality assurance program, approved by the Department of Health Services (DHS), for chemical tests to determine blood-alcohol content.
The statute provides that breath test analysis, such as the intoxilyzer, is “valid ... if it is performed according to methods approved by the department of health services ____” A.R.S. § 28-692(G) (emphasis supplied). A.R.S. § 28-692.03(A) states that “breath test” results “are admissible" in prosecutions under § 28-692 “upon establishing” certain “foundational requirements.” Among these are the requirements that the test operator “possessed a valid permit issued” by DHS and that the operator “complied with procedures existing at the time of the test which were established or approved by the department of health services.” (Subsec. A, pts. 2 and 4.) Subsection B of § 28-692.03 requires the Director of DHS to “promulgate rules prescribing methods and procedures for the administration of tests of blood, breath, urine or other bodily substance to determine blood alcohol content.” The rules promulgated by the Director and in effect at the time of defendant’s arrest provide as follows:
A. To promote the accuracy of test results obtained from approved breath testing devices, law enforcement agents conducting blood alcohol content determinations by means, of direct breath testing devices shall participate in a quality assurance program approved by the de *601 partment. This program shall include but is not limited to:
1. Procedures for calibration checks and standards for ensuring the proper operation of devices.
2. Calibration checks, performed under normal operating conditions and at regular intervals,____
3. Written certification that verifies the device was operating within the acceptable limits during each calibration check.
4. Records of such calibration checks, maintenance and written certification shall be kept by law enforcement agencies for each device____
B. The procedure for the operation of approved breath testing and/or collection devices shall utilize an operator checklist approved by the department for use of the specific device being operated.
C. Operator permit holders shall utilize written procedures for performing tests and collecting samples in the determination of blood alcohol content.
A.C.R.R. R-9-14-415 (emphasis supplied).
At trial, there was foundational evidence that the operator, device and method of testing had complied with the Tempe Police Department’s own standards, but there was no evidence that the test was performed according to methods “approved by” DHS, as required by § 28-692(G) and only arguable evidence that the operator who administered the test held a valid permit issued by DHS or complied with existing procedures established or approved by DHS. There was no evidence of participation in a “quality assurance program” or use of a DHS approved checklist. Thus, there was neither evidence of compliance with the “validity” requirements of § 28-692, the “admissibility” requirements of § 28-692.03(A), nor the regulations promulgated under § 28-692.03(B). However, the Tempe program did meet some of the standards which the regulations require. The State argues, therefore, that it was not error to admit the test results because the foundation did establish the reliability and accuracy of the results to the extent that admissibility of the test evidence was within the sound discretion of the trial judge. The prosecutor amicus argues also that failure to comply with the regulation goes to the weight and not the admissibility of the evidence; thus, substantial compliance is all that should be required.
There is a line of authority to that effect. For instance, in Oveson v. Municipality of Anchorage, 574 P.2d 801 (Alaska 1978), the court ruled that test results were admissible upon a showing of “substantial compliance” with the regulations. However, all that was involved in Oveson was the failure of the operator to check one out of nine boxes on the prescribed form. The act required by that portion of the standards had been performed, but the box to indicate the performance had inadvertently not been checked. We think Oveson and similar cases are inapposite. In the case at bench, noncompliance consisted of failure to do the required act (participate in a quality control program), rather than the mere failure to fill in the form evidencing that act.
The State also relies on People v. Adams, 59 Cal.App.3d 559, 131 Cal.Rptr. 190 (1976), which adopts a “goes to the weight not the admissibility” position. However, the basis for the California decision is that the California statute does no more than make compliance with departmental standards mandatory. The court concedes that where the legislature has expressly conditioned “validity” or “admissibility” on compliance, then “the effect of noncompliance is clear: the evidence may not be admitted.” 59 Cal.App.3d at 563, 131 Cal.Rptr. at 192-93. The notes to the decision list the numerous cases from other jurisdictions which follow a similar rationale.
The State argues that A.R.S. § 28-692.03(A), (quoted, in part, ante at p. 131), does not condition admissibility or validity of the test upon compliance with the regulations of the Department of Health Services. It therefore argues that we should follow People v. Adams, supra. We disagree and believe that § 28-692(G) and both subsec *602 tions of § 28-692.03 must be read in pari materia. Any other result would mean that a chemical test would be admissible even if not “valid,” or admissible if it complied with the five minimum standards contained in § 28-692.03(A), but did not comply with the regulations which subsection B of the same statute requires the director of DHS to issue in order to effectuate subsection A.
Second, we believe public policy requires us to interpret the statutes so as to require proof of compliance with the DHS regulations. Specific legislative intent with regard to the subtle question presented here is, of course, impossible to ascertain. However, there is little difficulty in seeing the overall legislative objective in adoption of the new law. The legislative goal was to establish a chemical standard which would be objective, uniform, and applied on a statewide basis in order to keep intoxicated drivers off the road. Given the problems mentioned above, there would be inherent deviation in test results if a particular test was performed in each jurisdiction with different standards and by different procedures for calibration, accuracy and quality control checks. Nothing would defeat the legislative objective more rapidly than to permit the various jurisdictions in Arizona to “go their own way” secure in the knowledge that a test made under their particular procedure would be admissible so long as they show the “accuracy and reliability” of their local methodology, notwithstanding that a different “accurate and reliable” procedure used in the adjoining town would have produced a different result in an otherwise identical situation. It was not within the legislative objective that a person would be found guilty if apprehended in Tempe but innocent in Mesa, or guilty in Maricopa County but not if arrested in Pinal. Guilt or innocence should not depend upon whether defendant was arrested on the north or south side of Baseline Road.
We hold, therefore, that the statutes are to be construed to mean just what they say. The test results will be “valid” if “performed according to methods approved by the department of health services” (A.R.S. § 28-692(G)), and thus will be “admissible” when it is established that the agency has complied with the standards required by A.R.S. § 28-692.03(A) and the rules promulgated under subsection B.
The State next argues that there was compliance with the quality assurance program required by DHS regulations. When the officer was questioned at the trial, he testified that he was unaware that the police department had a quality assurance program approved by DHS. The prosecution offered no evidence that the police department had participated in such a program, nor even that there had been any review by DHS of the department’s “in-house” quality control program. However, after the case had been appealed from the trial court to the superior court, the prosecutor attached a document entitled “Certificate of Approval” to a memorandum filed on appeal. By this “Certificate,”[9] the Department of Health Services attempts to certify that DHS had checked the Tempe Police Department’s quality control program, and found that it complied with DHS requirements and had done so from a date prior to defendant’s arrest. The conclusion we are asked to draw is that at all times the program of the Tempe Police Department was an “approved” DHS quality control program. We do not believe this “Certificate” ádds anything to the case. The effect of such “evidence,” had it been given at the trial, would be questionable at best. The effect of this “evidence” supplied by “certificate” submitted for the first time on appeal, is less than that. There are rules governing addition to or modification of the *603 record on appeal.[10] None of them provides for expanding the record by attaching pieces of paper to a party’s appeal brief.
We hold, therefore, that the State failed to provide proper foundation for the admission of the chemical test. The court erred in admitting that test. Since defendant was charged with driving in violation of A.R.S. § 28-692(B) and there was no admissible evidence with regard to the blood-alcohol level, the court should have granted defendant’s motion for acquittal. Accordingly, petitioner’s prayer for relief is granted; the judgment of conviction- is set aside and the case is remanded for entry of the judgment of acquittal.
HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.
SUPPLEMENTAL OPINION
FELDMAN, Justice.
The state has moved for reconsideration. In its primary argument, the state correctly points out that the version of A.R.S. § 28-692.03 which conditions admissibility of test results on utilization of approved procedure was not yet in effect at the time of the offense, and that the statute which was in effect only conditioned the validity of test results on following a proper “method.” The state argues, therefore, that whatever the requirements for admission under the present version of § 28-692.03, for this case all that was required was that the “method” used be one approved by the DHS. Differentiating between “method” and “procedure,” the state claims that “method” ■ means scientific process while “procedure” is the series of operations used to employ that scientific process. Thus, the state claims that the requirement necessary to admit Fuenning’s test results was less than that which would be required under the present version of the statute. According to the state, the lesser foundation was met since Exhibit 2 in evidence, a certificate from DHS, established that the type of device used for testing was one which had been previously approved by DHS for use in accordance with the manufacturer’s instructions.
The state argues, therefore, that since the statute did not condition “admissibility” of the evidence on compliance with this regulation (until § 28-692.03 was later revised) it need only prove “substantial compliance” under the rule of People v. Adams, 59 Cal.App.3d 559, 131 Cal.Rptr. 190 (1976). We disagree. The state’s entire argument is founded upon the method-procedure dichotomy and assumes, without citation of authority, that the legislature intended to differentiate between the “method” and “procedure.” Nothing in the statute as originally passed so indicates. No legislative history has been cited to support that contention. Method is commonly defined as “a means ... of procedure;” and “procedures and techniques characteristic of a particular discipline or field of knowledge.” The American Heritage Dictionary of the English Language, 826 (1979). “Methodology” is defined as the “system of principles, practices, and procedures applied to any specific branch of knowledge.” Id.
In common usage, method and procedure are interchangeable words, and we hesitate to impute some different intent to the legislature in the absence of support in the statute or its history. The only support which the state advances is the fact that while § 28-692 conditioned validity on following approved methods, DHS enacted an emergency regulation (A.C.R.R. R9-14412) replacing the previous rule of the same number. Under the previous rule, “method” was defined as the “procedure utilized” for the BAC determination. Thus, when the legislature passed the statute the words were synonyms in the DHS rules. In the emergency adoption DHS redefined the terms as follows:
*604 7. “Method” means the scientific process utilized by an analyst or by a device
10. “Procedure” means the steps utilized by the analyst or operator when employing an approved method or device
A.C.R.R. R9-14-412(7) and (10).
After DHS’ new regulatory definition of “method” and “procedure” went into effect the legislature again changed the statute. The provision in § 28-692(G) that validity was dependent upon following a “method” approved by the department was retained, and § 28-692.03 was amended to provide that admissibility of breath tests results would be conditioned, among other things, on compliance “with procedures existing at the time of the test which were established or approved by the department ____” § 28-692.03(A)(4). The legislature seems thus to have attempted to prevent the department from limiting its responsibility to approval of the scientific method (or device) and to have required DHS to take responsibility for the entire testing procedure.
We believe that this interpretation of legislative intent is more plausible than that advanced by the state and is certainly more in line with the legislative objective of adopting a single, uniform method as the statewide basis for determining the point at which it becomes unlawful to drive. Thus, the method (using the state’s definition and limiting that term to scientific process) was established by the foundation made at trial, but the “procedure” required by the regulation was not. Proof of proper method, absent proof of proper procedure, is not sufficient foundation.
While the state’s motion for rehearing questions how it would be possible to lay such foundation without producing DHS personnel to testify at every trial, we think the difficulties are not nearly so serious. Compliance may certainly be established by documentary evidence showing that certain procedures have been adopted as standards by the Department of Health Services. See Rules 803(6) and (8), 901(b), 902 and 1005, Ariz.R.Evid., 17A A.R.S. All that would be needed “live” would be testimony that the officer who had administered the test was aware of such procedures, had followed them and had utilized the written check-list of procedures in performing the tests. It might even be possible to lay the foundation by proving that procedures existing in the particular department which administered the test had been later checked and approved as being in compliance with the departmental standards.
Our comment (at 133-134) on the certificate attached to the state’s brief on appeal to the Superior Court related to after-the-fact approval of a particular methodology used in one particular police department. As we read the statute, DHS is not given authority to approve different types of procedures for use by different law enforcement agencies throughout the state, so that, for example, procedures in Mesa are approved, but are different from the approved procedures followed in Tempe. We believe the statute requires the Department to adopt a uniform set of procedures or standards for each approved device; such approved procedures would be used by every law enforcement agency throughout the state. The ease at bench illustrates the reason for this. The results of the tests given to this defendant showed a BAC of .11%. If procedures approved in Tempe for use of this device were different from those approved in Mesa, it is quite conceivable that an 11% difference in readings would be obtained[1] and defendant’s fate would depend on the side of the street upon which he was arrested. We do not believe this is good law, good policy, or what the legislature intended.
Regardless of whether the steps required to test for blood alcohol concentrations fall under its departmental classification of a “method” or “a procedure”, the department should follow the statutory mandate and enact or approve uniform *605 standards which can be followed by all agencies in the state. Proof of such standards and that the test was conducted in accordance with them, will establish the foundation necessary for admission.[2] All that was proved in the case at bench is that the test was administered in accordance with the manufacturer’s instructions and that the department had approved the particular device when so used. There was no evidence that these instructions set forth all the procedures necessary for collection of specimens and testing of samples, that the manufacturer’s instructions were the totality of approved procedures to be followed, or whether some additional procedures were necessary before or after use of the device. Thus, there was no foundation that the procedures required by the regulations in effect at the time of the incident (R9-14-415(A) and (B)) had been followed. As we interpret the statute, procedures were included within the term “method”; therefore, for the results to be “valid”, the foundation must show compliance with the procedures required by regulation. A.R.S. § 28-692(G).
We are also asked to reconsider the portion of the opinion, including footnote 7, in which we advise trial courts to exercise caution in the admission of opinions that the defendant was “drunk,” “under the influence” or “intoxicated”. Numerous cases have been cited to this court in which such opinions have been held admissible. Most of these cases do not address the issue upon which we commented. Such opinion evidence is usually admissible, even though the opinion “embraces an ultimate issue” of fact, Rule 704, Ariz.R.Evid. Notwithstanding that principle, opinion evidence is usually not permitted on how the jury should decide the case. See Comment to Rule 704, Ariz.R.Evid.; State v. Williams, 133 Ariz. 220, 650 P.2d 1202 (1982).
In our view, ordinarily it would be neither necessary nor advisable to ask for a witness’ opinion of whether the defendant committed the crime with which he was charged. When, in a DWI prosecution, the officer is asked whether the defendant was driving while intoxicated, the witness is actually being asked his opinion of whether the defendant was guilty. In our view, such questions are not within the spirit of the rules. See Rule 704 and Comment, Ariz.R.Evid. Ordinarily, more prejudice than benefit is to be expected from this type of questioning. It ordinarily would be proper to ask the witness in such a case whether he or she was familiar with the symptoms of intoxication and whether the defendant displayed such symptoms. The witness might be allowed to testify that defendant’s conduct seemed influenced by alcohol. However, testimony which parrots the words of the statute moves from the realm of permissible opinion which “embraces an ” issue of ultimate fact (Rule 704) to an opinion of guilt or innocence, which embraces all issues. This makes it easy for the jury to acquit or convict based on their empathy for the witness, rather than their consideration of the evidence. We see little to be gained and much risk from such methods. Id., Rule 403, Ariz.R. Evid.
Motion for reconsideration is denied.
HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

. Of course, the converse may be true. Alcohol is absorbed into the bloodstream and then eliminated or detoxified by the body. Therefore, the passage of time may mean that the level at the time of the test was, as the result of detoxification, less than at the time of arrest.

. We recently held that subsections A and B of the new Arizona statute "describe two separate offenses ____ The two offenses are not the same in law or fact.” Anderjeski v. City Court of the City of Mesa, 135 Ariz. 549, 551, 663 P.2d 233, 235 (1983). Thus, in Arizona, as in California, driving with a BAC of .10% or more is a separate crime from "driving under the influence.” Such statutes are commonly referred to as "per se” DWI laws.

. The amici submit as part of their brief portions of the testimony of scientific experts in several cases which have been tried in our municipal and justice courts and point out that in all but one of those cases, after hearing the scientific evidence regarding the inherent limitations of the tests, the magistrate or justice of the peace has ruled the statute unconstitutional.

. In addition, a recent study indicates that those who drink tend to underestimate the degree to which their abilities have been impaired. It also shows that even trained observers, such as bartenders and police officers, usually underestimate the degree of a subject’s intoxication. See Langenbucher & Nathan, Psychology, Public Policy and the Evidence for Alcohol Intoxication, American Psychologist (October 1983).

. For instance, while the governor’s chart might specify that an individual weighing 180 pounds could safely have five drinks in the space of an hour without exceeding a level of .09%, that person might well reach .10% or more if he drank on an empty stomach. Comparison of the chart attached as an exhibit to the amicus brief of the prosecutor with the facts contained in the matter submitted as exhibits to the defenders’ brief reveals considerable potential for inaccuracy in using the chart.

. The California Supreme Court granted hearing in Alfaro. Subsequent to the date on which we issued this opinion, the California Supreme Court ordered the appeal in Alfaro dismissed on procedural grounds. The legal theory espoused by the Alfaro court was rejected in Burg v. Municipal Court, 35 Cal.3d 257, 198 Cal.Rptr. 145, 673 P.2d 733 (1983).

. Reaching the chemical level of .10% requires consumption of a number of drinks (as much as a pint of whiskey, one to two six packs of beer, or a quart of wine) in a period of two or three hours.

. The admissibility of such statements in a prosecution for "driving under the influence" is also doubtful. While the rule does provide that opinion testimony "otherwise admissible is not objectionable" merely because it "embraces an ultimate issue,” the comment contains an important caveat:
Some opinions on ultimate issues will be rejected as failing to meet the requirement that they assist the trier of fact to understand the evidence or to determine a fact in issue. Witnesses are not permitted as experts on how juries should decide cases.
Comment, Rule 704, Ariz.R.Evid., 17A A.R.S.

. The check of procedures reflected in the certificate was made some time after defendant’s arrest and before his trial. The certificate was not submitted at trial. It first "came to light” when a copy was attached to the legal memo *603 randum filed by the State during the appeal proceedings in superior court.

. See, e.g., Ariz.R.Civ.App.Proc., Rule 11(e), 17A A.R.S.; Super.Ct. Criminal Appellate Proc. Rules, Rules 2, 7(d) and (9), 17A A.R.S.

. A 5% variance is acknowledged even with use of uniform procedures.

. Compliance with the other subsections of § 28-692.03 is, of course, also necessary. These include requirements that the test was performed using an approved device, that the operator possessed a valid permit issued by the department and that the device was in proper working order. These elements of the foundation were established in the case at bench.