718 P.2d 171

The STATE of Arizona, Petitioner,

v.

The SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF COCHISE, and the Hon. James L. Riley, Division III, Respondent,

and

Frederick Andrew BLAKE, Real Party in Interest.

No. 18343–PR.

Supreme Court of Arizona, En Banc.

April 7, 1986.

Alan K. Polley, Cochise Co. Atty. by Dennis L. Lusk, Deputy Co. Atty., Bisbee, for petitioner.

Robert F. Arentz, Cochise Co. Public Defender, Bisbee, for real party in interest.

Pima Co. Public Defender by Carla G. Ryan, Asst. Public Defender, Tucson, Thomas E. Collins, Maricopa Co. Atty. by Thomas E. Collins, Maricopa Co. Atty., and Patrick Sullivan, Deputy Co. Atty., Phoenix, Frederick S. Dean, Tucson City Atty. by Frederick S. Dean, Tucson City Atty., and R. William Call and Elisabeth C. Sotelo, Asst. City Attys., Tucson, Robert K. Corbin, Atty. Gen. by Robert K. Corbin, Atty. Gen., and Samuel Ruiz, Asst. Atty. Gen., Phoenix, Steven D. Neely, Pima Co. Atty. by Steven D. Neely, Pima County Atty., and John R. Gustafson and Sandra M. Hansen, Deputy Co. Attys., Tucson, for amicus curiae.

FELDMAN, Justice.

Frederick Andrew Blake, real party in interest, sought review of an opinion of the court of appeals that vacated the trial court's dismissal of his prosecution. *State v. Superior Court*, 149 Ariz. 287, 718 P.2d 189 (App.1985). We granted review because this is a case of first impression which presents significant issues of statewide importance to law enforcement. Rule 23, Ariz.R.Civ.App.P. 17A A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24. The issues raised are

1. whether the horizontal gaze nystagmus test is sufficiently reliable to establish probable cause for arrest for DUI, and

2. whether horizontal gaze nystagmus test results are sufficiently reliable to be introduced in evidence at trial.

## FACTS

In the early morning hours of March 18, 1985, Frederick Blake was driving a car on State Route 92, south of Sierra Vista. He was stopped by Officer Hohn who had observed the vehicle meandering within its lane, and who therefore suspected Blake of driving under the influence of alcohol. Noting, also, that Blake's appearance and breath indicated intoxication, the officer had Blake perform a battery of six field sobriety tests, including the horizontal gaze nystagmus (HGN) test. Nystagmus is an involuntary jerking of the eyeball. The jerking may be aggravated by central nervous system depressants such as alcohol or barbiturates. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1980 (14th ed. 1982). Horizontal gaze nystagmus is the inability of the eyes to maintain visual fixation as they are turned to the side.

In the HGN test the driver is asked to cover one eye and focus the other on an object (usually a pen) held by the officer at the driver's eye level. As the officer moves the object gradually out of the driver's field of vision toward his ear, he watches the driver's eyeball to detect involuntary jerking. The test is repeated with the other eye. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood alcohol content (BAC) exceeds the legal limit of .10 percent. Officer Hohn had been trained in the use of the HGN test and certified to administer it by the Arizona Law Enforcement Officer Advisory Council (ALEOC) pursuant to A.R.S. § 41–1822(4).

Blake's performance of the first three standard field sobriety tests was "fair" and did not amount to probable cause to arrest Blake for DUI. As a result of the HGN test, however, the officer estimated that Blake had a BAC in excess of .10 percent. Blake's performance on the last two tests strengthened his conclusion. Having also smelled a strong odor of alcohol on Blake's breath and noticed Blake's slurred speech and bloodshot, watery and dilated eyes, Officer Hohn then arrested Blake on a charge of felony DUI in violation of A.R.S. § 28–692. Hohn then transported Blake to the police station where he administered an intoxilyzer test which showed that Blake had a BAC of .163 percent.

Blake made two motions to the trial court: to dismiss the prosecution for lack of probable cause to arrest and to preclude the admission of testimony of the HGN test and its results at trial. At the evidentiary hearing on these two motions the state presented evidence regarding the principles and use of HGN testing from Dr. Marcelline Burns, a research psychologist who studies the effect of alcohol on behavior, Sgt. Richard Studdard of the Los Angeles Police Department, and Sgt. Jeffrey Raynor and Officer Robert Hohn of the Arizona Department of Public Safety.

Dr. Burns, Director the Southern California Research Institute (SCRI or Institute) testified that the Institute had received research contracts from the National Highway Traffic Safety Administration (NHTSA) to develop the best possible field sobriety tests. The result of this research was a three-test battery, which included the walk and turn, the one-leg stand, and the HGN. This battery could be administered without special equipment, required no more than five minutes in most cases, and resulted in 83 percent accuracy in determining BAC above and below .10 percent. Dr. Burns testified that all field sobriety tests help the police officers to estimate BAC. The HGN test is based on the known principle that certain toxic substances, including alcohol, cause nystagmus. The SCRI study found HGN to be the best single index of intoxication, because it is an involuntary response. BAC can even be estimated from the angle of onset of the involuntary jerking: 50 de-

grees minus the angle of the gaze at the onset of eye oscillation equals the BAC.[1] Dr. Burns testified that the HGN test had been accepted as valid by the highway safety field, including the NHTSA, Finnish researchers, state agencies such as the California Highway Patrol, Arizona Highway Patrol, Washington State Police, and numerous city agencies. Finally, the state offered in evidence an HGN training manual developed by the NHTSA for its nationwide program to train law enforcement officers. Both the manual and training program were based on the Institute's studies.

Sgt. Studdard is currently a supervisor in charge of DUI enforcement for the City of Los Angeles and a consultant to NHTSA on field sobriety testing. Based on his field work administering the HGN test and his participation in double blind studies at the Institute, he testified that the accuracy rate of the HGN test in estimating whether the level of BAC exceeds .10 percent is between 80 and 90 percent. According to Studdard the margin of inaccuracy is caused by the fact that certain drugs, such as barbiturates, cause the same effects as alcohol. We take notice, however, that nystagmus may also indicate a number of neurological conditions, and the presence of any of these would also affect the accuracy of the HGN-based estimate of blood alcohol content. *See infra* at 177. Both Sgt. Studdard and Sgt. Raynor, who currently administers the HGN training program for the State of Arizona, testified that the HGN test is especially useful in detecting violations where a driver with BAC over .10 percent is able to pull himself together sufficiently to pass the traditional field sobriety tests and thus avoid arrest and subsequent chemical testing.

Sgt. Raynor testified that the traditional field sobriety tests are not sensitive enough to detect dangerously impaired drivers with BAC between .10 percent and .14 percent and that the police officers thus must permit them to drive on.[2] Sgt. Raynor also testified as to the rigor and requirements of the Arizona training and certification program.

At the close of the evidentiary hearing, the trial court concluded that HGN represented a new scientific principle and was therefore subject to the *Frye* standard of admissibility. *Frye v. United States*, 293 Fed. 1013 (D.C.Cir.1923). The court ruled the HGN test did not satisfy *Frye*, was therefore unreliable, and could not form the basis of probable cause. The court granted Blake's motion to dismiss.

The state filed a petition for special action[3] in the court of appeals, which accepted jurisdiction and granted relief. The court of appeals noted that the *Frye* standard applies only to the admissibility of evidence at trial, not to probable cause for arrest. It stated that probable cause requires only reasonably trustworthy information sufficient to lead a reasonable person to believe that an offense has been committed and that the person to be arrested committed the offense. 149 Ariz. at 271, 718 P.2d at 173. The court of appeals found HGN sufficiently reliable to

---

1. Thus, nystagmus at 45° corresponds to a blood alcohol content (BAC) of 0.05%; nystagmus at 40° to a BAC of 0.10%; nystagmus at 35° to a BAC of 0.15%; and nystagmus at 30° to a BAC of 0.20%. *See* 1 R. ERWIN, DEFENSE OF DRUNK DRIVING CASES (3d ed. 1985) § 8.15A[1]. At BACs above 0.20%, a person's eyes may not be able to follow a moving object. Tharp, *Gaze Nystagmus As A Roadside Sobriety Test* 6 (unpublished paper available through SCRI). It should be noted however that when officers administer the test they do not necessarily measure the angle of onset; instead they look for three characteristics of high BAC: inability of smooth pursuit, distinct jerkiness at maximum deviation and onset of jerkiness prior to 45°. We do not address the admissibility of quantified BAC estimates based on angle of onset of nystagmus.

2. It is claimed that three times as many drivers on the road have BACs in the .10% to .14% range than in the .15% to .19% range, but those arrested are in the latter group, 2 to 1. Anderson, Schweitz & Snyder, *Field Evaluation of a Behavioral Test Battery for DWI*, U.S. Department of Transportation Rep. No. DOT HS–806–475 (1983) (included in state's evidence).

3. In Arizona, relief formerly obtained by writs of mandamus or prohibition is now obtained by "Special Action". *See* Rule 1, Arizona Rules of Procedure for Special Actions, 17A A.R.S.

provide probable cause. *Id.* 149 Ariz. at 273, 718 P.2d at 175. The court of appeals held that the HGN test satisfied *Frye* and would be admissible, except that there was insufficient foundation as to the arresting officer's proficiency in administering the test. *Id.* The court vacated the trial court's order and remanded for further proceedings.

## DISCUSSION

### 1. *Was Blake's Arrest Legal?*

Blake contends that the trial court correctly dismissed the prosecution after ruling that the HGN test did not meet the *Frye* standard. Because probable cause was established by "an unreliable test, the HGN, which has not had its trustworthiness corroborated," the arrest was illegal, and later discovered evidence, such as the intoxilyzer results, cannot be used in evidence.

The Pima County Public Defender, appearing amicus, argues that any roadside sobriety test is a full search and must, therefore, be founded on probable cause. Because the arresting officer testified that he did not have probable cause to arrest even after the performance of the traditional field tests, amicus argues that he did not have the requisite probable cause to administer the HGN test. For this contention amicus relies on *People v. Carlson,* 677 P.2d 310, 317 (Colo.1984), in which the Colorado Supreme Court held that "roadside sobriety testing constitutes a full 'search' in the constitutional sense of that term and therefore must be supported by probable cause."

■ For the reasons set forth below we agree with both of the state's arguments. First, administration of roadside, performance-based sobriety tests does not require probable cause. Second, neither evidence that forms the basis for probable cause nor that required to raise a reasonable suspicion need be tested under the *Frye* rule.

### *Did the Stop Followed by Field Sobriety Tests Violate the Fourth Amendment?*

■ The fourth amendment to the United States Constitution guarantees the right to be secure against unreasonable search and seizure. This guarantee requires arrests to be based on probable cause and permits limited investigatory stops based only on an articulable reasonable suspicion of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such stops are permitted although they constitute seizures under the fourth amendment. *See State v. Graciano,* 134 Ariz. 35, 37, 653 P.2d 683, 685 (1982). Officer Hohn testified that he stopped Blake because Blake's car had been weaving in its lane, and he suspected the driver to be under the influence of alcohol. We find that Blake's weaving was a specific and articulable fact which justified an investigative stop. The next question is whether this reasonable suspicion also justified compelling Blake to perform roadside sobriety tests.

An investigatory stop may include a safety frisk for weapons as well as questions to dispel the officer's reasonable suspicions. *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880. While all this may be done without the probable cause required for arrest, an arrest may occur before the moment the police officer either accuses the suspect of a specific offense or formally takes him into custody. It may be deemed to have occurred substantially before that time, perhaps during questioning. *See State v. Winegar* 147 Ariz. 440, 711 P.2d 579, 586 (1985).

In this case we confront the difficult area between the physical stop of defendant and the articulation of the charge. We must draw the line, however fine, between investigatory questioning that is permissible *before* the arrest and acts permissible only *after* the charges have been made. *See People v. Milham,* 159 Cal.App.3d 487, 500, 205 Cal.Rptr. 688, 697 (1984) (at scene of fatal car accident, field sobriety tests were investigatory). In a sense this is a

question of first impression. Our cases in the past have presumed that roadside sobriety tests are incident to the stop, and that chemical tests, such as the intoxilyzer, are incident to the arrest. *See Fuenning v. Superior Court,* 139 Ariz. 590, 680 P.2d 121 (1983).

Any examination of a person with a view to discovering evidence of guilt to be used in a prosecution of a criminal action is a search. The fourth amendment does not prohibit all warrantless searches, only those that are unreasonable. *State v. Hutton,* 110 Ariz. 339, 341, 519 P.2d 38, 40 (1974); *State v. Grijalva,* 111 Ariz. 476, 478, 533 P.2d 533, 535, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975). Whether the fourth amendment permits a warrantless search supported only by reasonable suspicion depends on the nature of both the governmental interest and the intrusion into a citizen's personal security. *State v. Grijalva, supra.* Thus, the necessity of the search is balanced against the invasion of the privacy of the citizen that the search entails. *Id.*

We have held that the state has a compelling interest in removing drunk drivers from the highways. *Fuenning v. Superior Court,* 139 Ariz. at 595, 680 P.2d at 126. The legislature has recognized the threat of drunk drivers and enacted A.R.S. § 28–692(B), which makes it *per se* illegal to drive with a BAC of .10 percent or more, a level at which virtually everyone's driving ability is impaired. *Id.* Against this compelling state interest we are to weigh the substantiality of the intrusion or inconvenience of roadside sobriety tests that measure physical performance of the suspected drunk driver.

In *Terry* the Supreme Court stated:

We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies .himself as a policeman and makes reasonable inquiries, and nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30, 88 S.Ct. at 1884.

■ We think *Terry* is on point: the threat to public safety posed by a person driving under the influence of alcohol is as great as the threat posed by a person illegally concealing a gun. If nothing in the initial stages of the stop serves to dispel the highway patrol officer's reasonable suspicion, fear for the safety of others on the highway entitles him to conduct a "carefully limited search" by observing the driver's conduct and performance of standard, reasonable tests to discover whether the driver is drunk. The battery of roadside sobriety tests is such a limited search. The duration and atmosphere of the usual traffic stop make it more analogous to a so-called *Terry* stop than to a formal arrest. *See Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). We refuse to adopt the rule of *People v. Carlson, supra.*

■ We hold, therefore, that roadside sobriety tests that do not involve long delay or unreasonable intrusion, although searches under the fourth amendment, may be justified by an officer's reasonable suspicion (based on specific, articulable facts) that the driver is intoxicated. We further find that Blake's erratic driving, appearance and smell of alcohol were specific, articulable facts which gave the officer sufficient grounds to administer roadside sobriety tests, including HGN.

### Is the HGN Test Sufficiently Reliable to Establish Probable Cause for Arrest?

Observing Blake's performance of the tests, the officer put him under arrest and took him to the station for chemical testing

for BAC. Blake argues the arrest was invalid for lack of probable cause and that the information obtained by later chemical testing is therefore inadmissible.

■ Probable cause may not rest on mere suspicion but neither must it rest on evidence sufficient to convict.

> In dealing with probable cause ... we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable [people], not legal technicians, act.

*Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Information sufficient to raise a suspicion of criminal behavior by definition need not pass tests of admissibility under our rules of evidence. It has long been the rule that an arresting officer has probable cause if he has reasonably trustworthy information sufficient to lead a responsible person to believe an offense has been committed and that the person to be arrested committed it. *See id.* at 175-76, 69 S.Ct. at 1310-11; *State v. Nelson,* 129 Ariz. 582, 586, 633 P.2d 391, 395 (1981). We now must determine whether the HGN test provides reasonably trustworthy information, sufficient to lead a reasonable person to believe a driver is intoxicated.

Nystagmus is a well known physiological phenomenon, defined and described in such tomes as WEBSTER'S NEW COLLEGIATE DICTIONARY (1980), DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (25th ed. 1974), 7 ENCYCLOPAEDIA BRITANNICA, MICROPAEDIA (15th ed. 1974) and STEDMAN'S MEDICAL DICTIONARY (5th Lawyer's ed. 1982). That it can be caused by ingestion of alcohol is also accepted in medical literature.

> Jerk nystagmus ... is characterized by a slow drift, usually away from the direction of gaze, followed by a quick jerk of recovery in the direction of gaze. A motor disorder, *it may be congenital or due to a variety of conditions affecting the brain, including ingestion of drugs such as alcohol* and barbiturates, palsy of lateral or vertical gaze, disorders of the vestibular apparatus and brainstem and cerebellar dysfunction.

THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1980 (14th ed. 1982) (emphasis added). Even before the Institute's federal grant, the relationship between BAC and nystagmus was recognized by some highway safety agencies as a tool to detect those illegally driving under the influence of alcohol. Burns & Moskowitz, *Psychophysical Tests for DWI Arrest,* U.S. Department of Transportation Rep. No. DOT-HS-802-424 (1977), at 80. In its federally funded study, the Institute discovered that of the six most sensitive field sobriety tests being used by the police around the country, the HGN was the most reliable and precise indicator of the proscribed level of BAC. *Id.* at 39.

Judicial assessment of whether the arresting officer had probable cause need not rest, however, on whether the information relied on is universally known. The arresting officer is entitled to draw specific reasonable inferences from the facts in light of his own experience, as well as the transmitted experience of other police officers. *See Terry v. Ohio, supra; State v. Ochoa,* 112 Ariz. 582, 585-86, 544 P.2d 1097, 1100-01 (1976). In this case Officer Hohn's experience included training in DUI detection and field administrations of the HGN test. His administration of the test did not cause him to arrest everyone he tested. He testified that although he had logged over 150 field administrations of the test battery, he had made only six DUI arrests. On the evening of Blake's arrest Officer Hohn had made between eight and twelve DUI stops, had given the battery to all, but found probable cause to arrest only Blake.

Testimony also showed that Officer Hohn's personal experience is the result of the transmitted experience of countless other trained highway safety officers. Dr. Burns testified that in a survey of the first 800 officers trained, over 80 percent rated HGN as the most sensitive roadside sobriety test and found the test battery to have increased their accuracy in recognizing the impaired driver. Sgt. Studdard, who esti-

mated he had administered the HGN test on the street to several thousand individuals, had seen only one or two people in whom the nystagmus did not correlate to the BAC. He testified that he had trained numerous agencies in Arizona, Michigan, New York, Arkansas, Louisiana, North Carolina and Maryland in the use of HGN. He found that the officers' accuracy rate in determining BAC was between 80 and 90 percent.

We conclude that the testimony presented at the evidentiary hearing regarding the reliability of the HGN test establishes that in the hands of a trained officer the test is reasonably trustworthy and may be used to help establish probable cause to arrest. We further find that Blake's driving, his "fair performance" on the traditional sobriety tests, the smell of alcohol on his breath, his appearance and his score on the HGN test could lead a reasonable person to believe Blake was driving with a BAC in excess of .10 percent in violation of A.R.S. § 28–692. Taken together there was more than sufficient evidence to establish probable cause. *People v. Milham*, 159 Cal.App.3d 487, 495, 205 Cal.Rptr. 688, 693 (1984); *People v. Trevisanut*, 160 Cal.App.3d Supp. 12, 17, 207 Cal.Rptr. 921, 924 (Cal.Super.1984). Because the trial court ruled that admissibility under *Frye* was a prerequisite for evidence used to establish probable cause, we vacate the trial court's order of dismissal of the case and remand the matter for trial.

2. *Are HGN Test Results Admissible Evidence?*

Our holding that when administered by properly trained and certified police officers the HGN test is sufficiently reliable to be used to establish probable cause does not mean the test results may be admitted in evidence on the question of guilt or innocence. In *Fuenning v. Superior Court, supra,* we held that if a defendant challenges the intoxilyzer test results, the conduct that provided probable cause becomes relevant to the question of the accuracy of the chemical analysis which alleg-

edly showed that the driver's BAC exceeded .10 percent, and thus may be admissible. We stated such admissible testimony might include "the manner in which he was driving [and] the manner in which he performed the field sobriety tests...." 139 Ariz. at 599, 680 P.2d at 130.

Unless the results of the HGN test are also admissible under our rules of evidence, when a driver challenges the chemical test results, the state may find itself in the position of being able to support the arrest with the results of the traditional field sobriety tests, but not the more probative HGN test results. This result is not unique.

> Much evidence of real and substantial probative value goes out on considerations irrelevant to its probative weight but relevant to possible misunderstanding or misuse by the jury.

*Brinegar v. United States,* 338 U.S. at 173, 69 S.Ct. at 1309.

### The "Frye Rule"

The HGN test is a different type of test from balancing on one leg or walking a straight line because it rests almost entirely upon an assertion of scientific legitimacy rather than a basis of common knowledge. Different rules therefore apply to determine its admissibility. *See State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 195, 644 P.2d 1266, 1281 (1982); *cf. State v. Roscoe,* 145 Ariz. 212, 700 P.2d 1312 (1984). It is to this question of HGN's admissibility that we now address ourselves.

Rules of evidence are aimed at preventing jury confusion, prejudice and undue consumption of time and trial resources. *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); Rule 403, Ariz.R.Evid., 17A A.R.S. Scientific evidence is a source of particular judicial caution. Because "science" is often accepted in our society as synonymous with truth, there is a substantial risk that the jury may give undue weight to such evidence. M. UDALL & J. LIVERMORE, LAW OF EVIDENCE § 102 (2d ed. 1982). If a technique has an "enormous effect in resolving completely a matter in controver-

sy," it must be demonstrably reliable before it is admissible. *Id.*

Before expert opinion evidence based on a novel scientific principle can be admitted, the rule of *Frye v. United States, supra,* requires that the theory relied on be in conformity with a generally accepted explanatory theory. *See Collins,* 132 Ariz. at 195, 644 P.2d at 1281. The purpose of this requirement is to assure the reliability of the testimony. Because HGN is a new technique based upon scientific principles, its reliability is to be measured against the *Frye* standard. *Id. Frye* screens out unreliable scientific evidence because under its standard

> it is not enough that a qualified expert, or even several experts, testify that a particular scientific technique is valid; *Frye* imposes a special burden—the technique must be *generally accepted by the relevant scientific community.*

*Symposium on Science and Rules of Evidence,* 99 F.R.D. 187, 189 (1984) (emphasis in original). Recognizing that judges and juries are not always in a position to assess the validity of the claims made by an expert witness before making findings of fact, *Frye* guarantees that reliability will be assessed by those in the best position to do so: members of the relevant scientific field who can dispassionately study and test the new theory.

If the scientific principle has gained general acceptance in the particular field in which it belongs, evidence resulting from its application is admissible, "subject to a foundational showing that the expert was qualified, the technique was properly used, and the results were accurately recorded." *Collins,* 132 Ariz. at 196, 644 P.2d at 1282.

To determine whether the HGN test satisfies the test of general acceptance we must (1) identify the appropriate scientific community whose acceptance of the nystagmus principles and validity of the HGN test is required, and (2) determine whether there is general acceptance of both the scientific principle and the technique applying the theory. *See Symposium,* 99 F.R.D. at 193; M. UDALL & J. LIVERMORE, *supra.* The admissibility of HGN test results under the *Frye* standard is an issue of first impression. Our search has not brought to light any reported American case law ruling on the issue.[4]

The state argues that the relevant scientific community is that of law enforcement and highway safety agencies and behavioral psychologists. Public defender amicus contends that we should disregard these sources and argues that the HGN phenomenon requires assessment by scientists in the fields of neurology, ophthalmology, pharmacology and criminalistics. It claims that narrowing the field deprives the general scientific community of the time needed to evaluate the procedure before it is examined by the legal community. We agree that validation studies must be performed by scientists other than those who have professional and personal interest in the outcome of the evaluation. *Collins,* 132 Ariz. at 199, 644 P.2d at 1285.

We believe, however, that the relevant scientific community that must be shown to have accepted a new scientific procedure is often self-selecting. Scientists who have no interest in a new scientific principle are unlikely to evaluate it, even if a court determines they are part of a relevant scientific community. The HGN test measures

---

**4.** We have discovered two cases that discuss the *admissibility* of nystagmus on the question of BAC. *People v. Loomis,* 156 Cal.App.3d Supp. 1, 203 Cal.Rptr. 767 (Cal.Super.1984); *State v. Nagel,* Ohio Ct.App. No. 2100, filed Feb. 5, 1986. In *Loomis* the superior court held the municipal court had erred in allowing the officer to testify as to his opinion based on training, experience and the number of times he had given the test. The court in dictum then stated that it *would also have been error* to admit the officer's testimony as an expert opinion because the state had failed to demonstrate that the nystagmus test was reliable by showing it had gained general acceptance in the particular field in which it belongs, as required by *Frye.* In *Nagel,* the court of appeals affirmed the trial court's admission of testimony on HGN. Rejecting appellant's argument that it was inadmissible because the testifying officer was not an expert and there was no scientific basis for the HGN test, the court held nystagmus is objectively observable and requires no expert interpretation.

a behavioral phenomenon: specifically the effects of alcohol on one aspect of human behavior, the movement of the eye. Thus, it stands to reason that experimental psychologists in the area of behavioral psychology would be interested in verifying the validity of the HGN test and should be included in the relevant scientific community. Similarly, the problem of alcohol's effect on driving ability is a major concern to scientists in the area of highway safety and they, too, should be included.

We disagree with the defendant's implication that those in the field of highway safety or law enforcement are necessarily biased. We believe the National Highway Traffic Safety Administration's interest in funding research to identify the drunk driver is not subject to question in this instance. The NHTSA was addressing a complex problem: every state has either a presumptive or "per se illegal" law that makes reference to BAC (typically .10 percent). Officers whose task it is to remove violators of these laws from the roads may, upon initial suspicion, administer behavioral tests, but until recently the relationship of the tests to specific BAC levels was not well documented. The purpose of NHTSA's program was to develop a test battery to assist officers in discriminating between those drivers who are in violation of these laws and those who are not. Furthermore, it is not to the advantage of law enforcement in the highway safety field to have an unreliable field sobriety test. It is inefficient to arrest and transport a driver for chemical testing, only to find that he is not in violation of the law. We believe that the work of highway safety professionals and behavioral psychologists who study effects of alcohol on behavior is directly affected by the claims and application of the HGN test, so that both these groups must be included in the relevant scientific community.

We are not forced to come to the same conclusion with respect to neurologists, pharmacologists, ophthalmologists and criminalists. Although it is true that the form of nystagmus that concerns us is the result of a neurological malfunction, we agree with Dr. Burns who testified that "the field of neurology does not concern itself specifically with alcohol effects on performance and even more specifically with field sobriety." She did state, however, that a "very small segment of the neurology community" concerns itself with the effects and has produced some literature. No argument has been made why the fields of pharmacology, ophthalmology and criminalistics (beyond those concerned with detecting violators of DUI laws) should be included in the relevant scientific community and no convincing reason occurs to us. We conclude, therefore, that to determine whether the HGN test satisfies the *Frye* requirement of general acceptance the appropriate disciplines include behavioral psychology, highway safety and, to a lesser extent, neurology and criminalistics.

We now turn to the question of whether there has been general acceptance of both the HGN test and its underlying principle. The burden of proving general acceptance is on the proponent of the new technique; it may be proved by expert testimony and scientific and legal literature. We have already summarized the expert testimony presented by the state, *supra* at 173. In addition, the state submitted both scientific publications and reports of research done for the United States Department of Transportation. These are listed in Appendix A.

At the evidentiary hearing Blake presented no evidence to refute either the substance of the expert opinion testimony or the contention that it had general acceptance. Blake and public defender amicus instead argued that there is a paucity of literature and that the appropriate scientific disciplines have not yet had the opportunity to duplicate and evaluate Dr. Burns' work.

Our own research is listed in Appendix B. The literature demonstrates to our satisfaction that those professionals who have investigated the subject do not dispute the strong correlation between BAC and the

different types of nystagmus. *Cf. State v. Valdez,* 91 Ariz. 274, 371 P.2d 894 (1962) (concluding that lie detector tests have not been accorded such recognition). Furthermore, those who have investigated the relation between BAC and nystagmus as the eye follows a moving object have uniformly found that the higher the BAC, the earlier the onset of involuntary jerking of the eyeball. Although the publications are not voluminous, they have been before the relevant communities a considerable period of time for any opposing views to have surfaced. *See* Appendix B.

■■■ Based on all the evidence we conclude there has been sufficient scrutiny of the HGN test to permit a conclusion as to reliability. The "general acceptance" requirement does not necessitate a showing of universal acceptance of the reliability of the scientific principle and procedure. *United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977) (unanimity of scientific opinion is not required); J. RICHARDSON, MODERN SCIENTIFIC EVIDENCE 164 (2d ed.1974) ("substantial majority" is sufficient to show general acceptance). Neither must the principle and procedure be absolutely accurate or certain. *State v. Valdez,* 91 Ariz. at 280, 371 P.2d at 898.

■■■ We believe that the HGN test satisfies the *Frye* standard. The evidence demonstrates that the following propositions have gained general acceptance in the relevant scientific community: (1) HGN occurs in conjunction with alcohol consumption; (2) its onset and distinctness are correlated to BAC; (3) BAC in excess of .10 percent can be estimated with reasonable accuracy from the combination of the eyes' tracking ability, the angle of onset of nystagmus and the degree of nystagmus at maximum deviation; and (4) officers can be trained to observe these phenomena sufficiently to estimate accurately whether BAC is above or below .10 percent. We therefore hold that, with proper foundation as to the techniques used and the officer's ability to use it (*see Collins,* 132 Ariz. at 196, 644 P.2d at 1282), testimony of defendant's nystagmus is admissible on the issue of a defendant's blood alcohol level as would be other field sobriety test results on the question of the accuracy of the chemical analysis.

Our holding *does not mean* that evidence of nystagmus is admissible to prove BAC of .10 percent or more in the absence of a laboratory chemical analysis of blood, breath or urine. Such a use of HGN test results would raise a number of due process problems different from those associated with the chemical testing of bodily fluids. The arresting officer's "reading" of the HGN test cannot be verified or duplicated by an independent party. *See Scales v. City Court of Mesa,* 122 Ariz. 231, 594 P.2d 97 (1979). The test's recognized margin of error provides problems as to criminal convictions which require proof of guilt beyond a reasonable doubt. The circumstances under which the test is administered at roadside may affect the reliability of the test results. Nystagmus may be caused by conditions other than alcohol intoxication. And finally, the far more accurate chemical testing devices are readily available.

Our limitation on the use of HGN test results is also consistent with Arizona's DUI statute. When referring to the tests to be administered to determine BAC, the statute speaks in terms of *taking* blood, urine and breath samples from the defendant for *analysis. See* A.R.S. § 28-692(H). Clearly, BAC under § 12-692 is to be determined deductively from analysis of bodily fluids, not inductively from observation of involuntary bodily movements.

■■■ We also hold, therefore, that regardless of the quality and abundance of other evidence, a person may not be convicted of a violation of A.R.S. § 28-692(B) without chemical analysis of blood, breath or urine showing a proscribed blood alcohol content pursuant to title 28, article 5 of the Arizona Revised Statutes. Similarly, the presumption under A.R.S. § 28-692(E)(3) that a defendant was under the influence of intoxicating liquor in violation of subsection (A) must also rest on chemical "analysis of the defendant's blood, urine, breath or other bodily substance," A.R.S. § 28-

692(E), as the statute clearly states, and not on a BAC estimate based on nystagmus. Thus, evidence of HGN test results is admissible, as is other evidence in subsection (B) cases, only to corroborate the challenged accuracy of the chemical test results. *See Fuenning v. Superior Court*, 139 Ariz. at 599, 680 P.2d at 130. It is admissible in subsection (A) cases for the same purpose and, also, as evidence that the driver is "under the influence." It is *not admissible* in any criminal case as direct independent evidence *to quantify* blood alcohol content.

## CONCLUSION

We find that the horizontal gaze nystagmus test properly administered by a trained police officer is sufficiently reliable to be a factor in establishing probable cause to arrest a driver for violating A.R.S. § 28–692(B). We further find that the horizontal gaze nystagmus test satisfies the *Frye* test for reliability and may be admitted in evidence to corroborate or attack, but not to quantify, the chemical analysis of the accused's blood alcohol content. It may not be used to establish the accused's level of blood alcohol in the absence of a chemical analysis showing the proscribed level in the accused's blood, breath or urine. In subsection (A) prosecutions it is admissible, as is other evidence of defendant's behavior, to prove that he was "under the influence."

We approve the court of appeals' opinion, as modified, vacate the trial court's dismissal of the Blake prosecution for violation of A.R.S. § 28–692(B), and remand for proceedings not inconsistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

## APPENDIX A

1. Anderson, Schweitz & Snyder, *Field Evaluation of a Behavioral Test Battery for DWI*, U.S. Dept. of Transportation Rep. No. DOT–HS–806–475 (1983) (field evaluation of the field sobriety test battery (HGN, one leg stand, and walk and turn) conducted by police officers from four jurisdictions indicated that battery was ap-

proximately 80 percent effective in determining BAC above and below .10 percent).

2. Burns & Moskowitz, *Psychophysical Tests for DWI Arrest*, U.S. Dept. of Transportation Rep. No. DOT–HS–802–424 (1977) (recommended the three-test battery developed by SCRI (one leg stand, walk and turn, and HGN) to aid officers in discriminating BAC level).

3. Compton, *Use of the Gaze Nystagmus Test to Screen Drivers at DWI Sobriety Checkpoints*, U.S. Dept. of Transportation (1984) (field evaluation of HGN test administered to drivers through car window in approximately 40 seconds: "the nystagmus test scores identified 95% of the impaired drivers" at 2; 15 percent false positive for sober drivers, *id.*).

4. 1 R. ERWIN, DEFENSE OF DRUNK DRIVING CASES (3d ed. 1985) ("A strong correlation exists between the BAC and the angle of onset of [gaze] nystagmus." *Id.* at § 8.15A[3]).

5. Rashbass, *The Relationship Between Saccadic and Smooth Tracking Eye Movements*, 159 J. PHYSIOL. 326 (1961) (barbiturate drugs interfere with smooth tracking eye movement).

6. Tharp, Burns & Moskowitz, *Development and Field Test of Psychophysical Tests for DWI Arrests*, U.S. Dept. of Transportation Rep. No. DOT–HS–805–864 (1981) (standardized procedures for administering and scoring the SCRI three-test battery; participating officers able to classify 81 percent of volunteers above or below .10 percent).

7. Wilkinson, Kime & Purnell, *Alcohol and Human Eye Movement*, 97 BRAIN 785 (1974) (oral dose of ethyl alcohol impaired smooth pursuit eye movement of all human subjects).

## APPENDIX B

1. Aschan, *Different Types of Alcohol Nystagmus*, 140 ACTA OTOLARYNGOL SUPP. 69 (Sweden 1958) ("From a medicolegal viewpoint, *simultaneous* recording of AGN [Alcohol Gaze Nystagmus] and PAN [positional alcoholic nystagmus] should be of value, since it will show in which phase the patient's blood alcohol curve is....").

2. Aschan & Bergstedt, *Positional Alcoholic Nystagmus in Man Following Repeated Alcohol Doses*, 80 ACTA OTOLARYNGOL SUPP. 330 (Sweden 1975) (abstract available on DIALOG, file 173:Embase 1975–79) (degree of intoxication influences both PAN I and PAN II).

3. Aschan, Bergstedt, Goldberg & Laurell, *Positional Nystagmus in Man During and After Alcohol Intoxication*, 17 Q.J. OF STUD. ON ALCOHOL, Sept. 1956, at 381. Study distinguishing two types of alcohol-induced nystagmus, PAN (positional alcoholic nystagmus) I and PAN II, found intensity of PAN I, with onset about one-half hour after alcohol ingestion, was proportional to amount of alcohol taken.

4. Baloh, Sharma, Moskowitz & Griffith, *Effect of Alcohol and Marijuana on Eye Movements*, 50 AVIAT. SPACE ENVIRON. MED., Jan. 1979, at 18 (abstract available on DIALOG, file 153:Medline 1979–79) (smooth pursuit eye movement effects of alcohol overshadowed those of marijuana).

5. Barnes, *The Effects of Ethyl Alcohol on Visual Pursuit and Suppression of the Vestibulo-Ocular Reflex*, 406 ACTA OTOLARYNGOL SUPP. 161 (Sweden 1984) (ethyl alcohol disrupted visual pursuit eye movement by increasing number of nystagmic "catch-up saccades").

6. Church & Williams, *Dose- and Time-Dependent Effects of Ethanol*, 54 ELECTROENCEPHALOGRAPHY & CLIN. NEUROPHYSIOL., Aug. 1982, at 161 (abstract available on DIALOG, file 11:Psychinfo 1967–85 or file 72:Embase 1982–85) (positional alcohol nystagmus increased with dose levels of ethanol).

7. Fregly, Bergstedt & Graybiel, *Relationships Between Blood Alcohol, Positional Alcohol Nystagmus and Postural Equilibrium*, 28 Q.J. OF STUD. ON ALCOHOL, March 1967, at 11, 17 (declines from baseline performance levels correlated with peak PAN I responses and peak blood alcohol levels).

8. Goldberg, *Effects and After-Effects of Alcohol, Tranquilizers and Fatigue on Ocular Phenomena,* ALCOHOL AND ROAD TRAFFIC 123 (1963) (of different types of nystagmus, alcohol gaze nystagmus is the most easily observed).

9. Helzer, *Detecting DUIs Through the Use of Nystagmus*, LAW AND ORDER, Oct. 1984, at 93 (nystagmus is "a powerful tool for officers to use at roadside to determine BAC of stopped drivers ... [O]fficers can learn to estimate BACs to within an average of 0.02 percent of chemical test readings." *Id.* at 94).

10. Lehti, *The Effect of Blood Alcohol Concentration on the Onset of Gaze Nystagmus*, 136 BLUTALKOHOL 414 (West Germany 1976) (abstract available on DIALOG, file 173:Embase 1975–79) (noted a statistically highly significant correlation between BAC and the angle of onset of nystagmus with respect to the midpoint of the field of vision).

11. Mizoi, Hishida & Maeba, *Diagnosis of Alcohol Intoxication by the Optokinetic Test*, 30 Q.J. OF STUD. ON ALCOHOL 1 (March-June 1969) (optokinetic nystagmus, ocular adaptation to movement of object before eyes, can also be used to detect central nervous system impairment caused by alcohol. Optokinetic nystagmus is inhibited at BAC of only .051 percent and can be detected by optokinetic nystagmus test. Before dosage subjects could follow a speed of 90 degrees per second; after, less than 70 degrees per second).

12. Murphree, Price & Greenberg, *Effect of Congeners in Alcoholic Beverages on the Incidence of Nystagmus*, 27 Q.J. OF STUD. ON ALCOHOL, June 1966, at 201 (positional nystagmus is a consistent, sensitive indicator of alcohol intoxication).

13. Nathan, Zare, Ferneau & Lowenstein, *Effects of Congener Differences in Alcoholic Beverages on the Behavior of Alcoholics*, 5 Q.J. OF STUD. ON ALCOHOL SUPP., May 1970, at 87 (abstract available on DIALOG, file 11:Psycinfo 1967–85) (incidence of nystagmus and other nystagmoid movements increased with duration of drinking).

14. Norris, *The Correlation of Angle of Onset of Nystagmus With Blood Alcohol*

*Level: Report of a Field Trial,* CALIF. ASS'N CRIMINALISTICS NEWSLETTER, June 1985, at 21 (The relationship between the ingestion of alcohol and the inset of various kinds of nystagmus "appears to be well documented." *Id.* "While nystagmus appears to be useful as a roadside sobriety test, at this time, its use to predict a person's blood alcohol level does not appear to be warranted." *Id.* at 22).

15. Nuotto, Palva & Seppala, *Naloxone Ethanol Interaction in Experimental and Clinical Situations,* 54 ACTA PHARMACOL. TOXICOL. 278 (1984) (abstract available on DIALOG, file 5::Biosis Previews 1981–86) (ethanol alone does-dependently induced nystagmus).

16. Oosterveld, Meineri & Paolucci, *Quantitative Effect of Linear Acceleration on Positional Alcohol Nystagmus,* 45 AEROSPACE MEDICINE, July 1974, at 695 (G-loading brings about PAN even when subject has not ingested alcohol; however when subjects ingested alcohol, no PAN was found when subjects were in supine position, even with G-force at 3).

17. Penttila, Lehti & Lonnqvist, *Nystagmus and Disturbances in Psychomotor Functions Induced by Psychotropic Drug Therapy,* 1974 PSYCHIAT. FENN. 315 (abstract available on DIALOG, file 173:Embase 1975–79) (psychotropic drugs induce nystagmus).

18. Savolainen, Riihimaki, Vaheri & Linnoila, *Effects of Xylene and Alcohol on Vestibular and Visual Functions in Man,* SCAND. J. WORK ENVIRON. HEALTH 94 (Sweden 1980) (abstract available on DIALOG, file 172:Embase 1980–81 on file 5:Biosis Previews 1981–86) (the effects of alcohol on vestibular functions (e.g. positional nystagmus) were dose-dependent).

19. Seelmeyer, *Nystagmus, A Valid DUI Test,* LAW AND ORDER, July 1985, at 29 (horizontal gaze nystagmus test is used in "at least one law enforcement agency in each of the 50 states" and is "a legitimate method of establishing probable cause." *Id.*).

20. Tharp, Moskowitz & Burns, *Circadean Effects on Alcohol Gaze Nystagmus* (paper presented at 20th annual meeting of Society for Psychophysiological Research), abstract in 18 PSYCHOPHYSIOLOGY, March 1981 (highly significant correlation between angle of onset of AGN and BAC).

21. Umeda & Sakata, *Alcohol and the Oculomotor System,* 87 ANNALS OF OTOLOGY, RHINOLOGY & LARYNGOLOGY, May-June 1978, at 392 (in volunteers whose "caloric eye tracking pattern" (CETP) was normal before alcohol intake, influence of alcohol on oculomotor system appeared consistently in the following order: (1) abnormality of CETP, (2) positional alcohol nystagmus, (3) abnormality of eye tracking pattern, (4) alcohol gaze nystagmus).

22. Zyo, *Medico-Legal and Psychiatric Studies on the Alcoholic Intoxicated Offender,* 30 JAPANESE J. OF LEGAL MED., No. 3, 1976, at 169 (abstract available on DIALOG, file 21:National Criminal Justice Reference Service 1972–85) (recommends use of nystagmus test to determine somatic and mental symptoms of alcohol intoxication as well as BAC).