IN THE SUPREME COURT OF MISSISSIPPI
NO. 94-KA-01049-SCT

*EUGENE YOUNG A/K/A EUGENE R. YOUNG*

*v.*

*CITY OF BROOKHAVEN*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/94 |
| TRIAL JUDGE: | HON. KEITH STARRETT |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | V. W. CARMODY, JR. |
| | PAMELA L. CASTLE |
| ATTORNEY FOR APPELLEE: | JOHN D. SUTTON |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - MISDEMEANOR |
| DISPOSITION: | AFFIRMED - 5/15/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/5/97 |

**BEFORE DAN LEE, C.J., BANKS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On September 27, 1993, Eugene R. Young was found guilty of driving under the influence of intoxicating liquor, **Miss. Code Ann.** § 63-11-30 (1)(c), first offense in Brookhaven Municipal Court. On September 29, 1993, Eugene R. Young perfected an appeal to the Lincoln County Circuit Court requesting a trial de novo of the Municipal Court's findings. The state prosecuted Young on charges of careless driving and driving while intoxicated. The jury found Young guilty on both charges. The trial court sentenced Young to 48 hours of community service and a fine of $800 for D.U.I. and $75 for careless driving. Young perfected his appeal to this Court questioning:

> **1. Whether reversible error occurred when the prosecution was permitted to proceed at trial under both sections 63-11-30(1)(a) and 63-11-30(1)(c) of the Mississippi Code?**

> **2. Whether reversible error occurred when evidence regarding certain field sobriety tests**

**was admitted at trial?**

**3. Whether reversible error occurred when evidence regarding the intoxilyzer results was admitted at trial?**

## FACTS

¶2. On Saturday, July 31, 1993, Eugene Young and his brother spent the day fishing and swimming at a lake in Hammond, Louisiana. Between 12:00 A.M. and 5:00 P.M., the two brothers testified to drinking between six and eight twelve ounce beers each. During this time, they hiked, swam, and enjoyed other outdoor activities. Upon leaving the park at 5:00, the brothers traveled to a friend's house in Hammond where they stayed until 7:30 P.M. Soon thereafter, Young and his brother began driving north on I-55 heading to Young's home in Richland, Mississippi.

¶3. South of Brookhaven, Young testified to becoming tired and crossing lanes. After stopping at a rest area for a few minutes, the brothers continued the northward journey. In Brookhaven, the brothers exited the interstate, traveled down Brookway Boulevard, and drove through Taco Bell. Brookway Boulevard is a five lane undivided highway with a center turning lane. After leaving Taco Bell, Young turned right on Brookway, allegedly straddled the westbound lanes and apparently could not decide in which lane to travel. At approximately 10:00 P.M., Young turned onto the I-55 northbound on-ramp where he was stopped by Officers Hart and Brister.

¶4. Officer Brister administered three field sobriety tests including the "ABC" and the Horizontal Gaze Nystagmus (HGN) tests. The officer testified that he attempted to give Young a "heel - toe" test as well, but that the test was not completed since the officer was already confident of Young's intoxication. Young was then handcuffed, frisked, and taken to the Lincoln County Sheriff's department. 19 minutes later, Young was administered a breath test on an intoxilyzer. Young returned a blood alcohol content of .285. At trial, Young's expert testified that to test .285 an hour after stopping drinking, one must consume 17 beers within two hours of testing.

## DISCUSSION

**1. Whether reversible error occurred when the prosecution was permitted to proceed at trial under both sections 63-11-30(1)(a) and 63-11-30(1)(c) of the Mississippi Code?**

¶5. Eugene Young asserts that the state's failure to elect which D.U.I. offense upon which to prosecute Young constituted reversible error. Young states that **Miss. Code Ann.** § 63-11-30(1)(a) and 63-11-30(1)(c) constitute separate crimes which must be defended in different ways. The relevant portion of the Mississippi D.U.I. statute reads as follows:

(1) It is unlawful for any person to drive or otherwise operate a vehicle within this state who **(a) is under the influence of intoxicating liquor;** (b) is under the influence of any other substance which has impaired such person's ability to operate a motor vehicle; **(c) has ten one-hundredths percent (.10%) or more** for persons who are above the legal age to purchase alcoholic beverages under state law, or eight one-hundredths percent (.08%) or more for persons who are below the legal age to purchase alcoholic beverages under state law, in the person's blood based upon grams of alcohol per one hundred (100) milliliters of blood or grams

of alcohol per two hundred ten (210) liters of breath as shown by a chemical analysis of such person's breath, blood or urine administered as authorized by this chapter; (d) is under the influence of any drug or controlled substance, the possession of which is unlawful under the Mississippi Controlled Substances Law; **or** (e) has an alcohol concentration of four one-hundredths percent (.04%) or more, based upon grams of alcohol per one hundred (100) milliliters of blood or grams of alcohol per two hundred ten (210) liters of breath as shown by a chemical analysis of such person's blood, breath or urine, administered as authorized by this chapter for persons operating a commercial motor vehicle.

**Miss. Code Ann.** § 63-11-30(1) (1996).[1]

¶6. Young asserts that since the subsections are separated by "or", the state has an option of charges. Young describes § 63-11-30 (1)(a) as the "common-law" D.U.I. charge while (1)(c) is a "per-se" violation. *See Fisher v. City of Eupora*, 587 So. 2d 878, 888 (Miss. 1991). He points out that it is possible for the state to charge a driver under (1)(a) while not charging under (1)(c) and vice-versa. He asserts that the state's prosecution under both subsections resulted in prejudice to his defense since different evidence and strategies may be required to defend against the two differing charges. The state discounts this assertion by stating that § 63-11-30 (1) contains four different ways to commit the same offense.

¶7. We have not previously addressed this issue and find it helpful to review the outcome of similar cases in the courts of our sister states. The Arkansas D.U.I. statute reads as follows:

(a) It is unlawful and punishable as provided in this act for any person who is intoxicated to operate or be in actual physical control of a motor vehicle.

(b) It is unlawful and punishable as provided in this act for any person to operate or be in actual physical control of a motor vehicle if at that time there was one-tenth of one percent (0.10%) or more by weight of alcohol in the person's blood as determined by a chemical test of the person's blood, urine, breath, or other bodily substance.

**Ark. Code Ann. § 5-65-103 (1995)**. In *Johnston v. City of Fort Smith*, 690 S.W.2d 358, 369 (Ark. 1985), the appellant asserted the failure to specify the subsection of the Arkansas D.U.I. law they were charged constituted reversible error. *Johnston*, 690 S.W.2d at 369 (Ark. 1985). The Arkansas Court has found that the two-subsections are "simply two different ways to prove a single violation." *Id.* The Arkansas Court concluded that "the penalty is the same whether the act is violated by conduct proscribed by either subsection. . . ." *Id.*

¶8. Alabama has a similar statute;

(a) A person shall not drive or be in actual physical control of any vehicle while:

(1) There is 0.08 percent or more by weight of alcohol in his or her blood;

(2) Under the influence of alcohol;

(3) Under the influence of a controlled substance to a degree which renders him or her incapable of safely driving;

(4) Under the combined influence of alcohol and a controlled substance to a degree which renders him or her incapable of safely driving; or

(5) Under the influence of any substance which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving.

**Ala. Code Ann. § 32-5A-191 (Ala. 1996).** The Alabama Court has also found that "subsections (1) and (2) are not separate offenses, but are two methods of proving the same offense -- driving under the influence of alcohol." *Buckner v. City of Huntsville*, 549 So. 2d 451, 452 (Ala. 1989)(citing *Sisson v. State*, 528 So. 2d 1159 (Ala. 1988).

¶9. We interpret the Mississippi Statute in the same manner. **Miss. Code Ann.** § 63-11-30 merely sets forth numerous methods of committing the same crime. Therefore, we find no merit in this assertion of error.

### 2. Whether reversible error occurred when evidence regarding certain field sobriety tests was admitted at trial?

¶10. Young asserts that the trial court committed reversible error in "admitting evidence of certain field sobriety tests over objection where no scientific foundation was laid or a correlation established between the results of the [tests] and the presence of intoxication."

**Standard of Review**

¶11. This Court has set forth the following standard of review in determining the appropriateness of the admission of evidence:

> Under the Supreme Court's standard of review, the admissibility of evidence rests within the discretion of the trial court. *Baine v. State,* 1076, 1078 (Miss. 1992); *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991). However, this Court must also determine whether the trial court employed the proper legal standards in its fact findings governing evidence admissibility. *Baine v. State of Mississippi*, 606 So. 2d at 1078. If in fact the trial court has incorrectly perceived the applicable legal standard in its fact findings, the Court applies a substantially broader standard of review. *Id.* However, a denial of a substantial right of the defendant must have been affected by the court's evidentiary ruling. *Jackson v. State*, 645 So. 2d 921 (Miss. 1994); *Newsom v. State*, 629 So. 2d 611, 612 (Miss. 1993); *Collins v. State*, 594 So. 2d 29, 34 (Miss. 1992). Furthermore, the trial court's discretion must be exercised within the scope of the Mississippi Rules of Evidence and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs. *Parker v. State*, 606 So. 2d 1132, 1137-1138 (Miss. 1992).

*Peterson v. State*, 671 So. 2d 647, 655-56 (Miss. 1996). We have also stated that "[t]he mere fact that the trial court committed error in an evidentiary ruling does not by itself warrant a reversal by this Court." *Peterson*, 671 So. 2d at 656.

*Admission of Horizontal Gaze Nystagmus Test*

¶12. Young asserts that the trial court abused its discretion by allowing the state to present evidence

of the administration of three field sobriety tests by a police officer even though the officer had not been qualified as an expert witnesses. Furthermore, Young asserts that the evidence was not generally accepted as having scientific value as required by *Polk v. State*, 612 So. 2d 381 (Miss. 1992)(citing *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). *Polk* requires that "the thing from which the deduction is made [be] sufficiently established to have gained general acceptance in the particular field in which it belongs." *Polk*, 612 So. 2d at 390.[(2)]

¶13. Young asserts that even thought the trial court ruled in a motion in limine that the horizontal gaze nystagmus test and the "ABC" test could not be allowed as scientific evidence to "determine a specific level of blood alcohol," it was actually allowed at trial.

> Q Scott, in your training at the Law Enforcement Academy, what special training, if any, did you have regarding determining if an individual was intoxicated or not?
>
> A Went through a course of running the intoxilyzer and determining about public drunks and determining how to use gaze nystagmus.
>
> Q Just briefly, what is gaze nystagmus?
>
> A Gaze nystagmus is a technique used on the field sobriety test to determine the involuntary movement of the eyes.
>
> Q And why would that be important?
>
> A A sober person, his eyes would move at a smooth rotation, back and forth. If he's been drinking or intoxicated, they would have a jerking motion. Depending on how much he's had to drink is how much they're going to jerk and to what degree.
>
> Q Is it fair to say that the more someone drinks the more someone's eyes jerk?
>
> A Yes.
>
> Q Have you had an occasion to give a gaze nystagmus test since you graduated from the Highway Patrol Academy?
>
> A Several.
>
> Q You say several. How many do you --
>
> A It's hard to say. It's more than fifty.
>
> Q Have you ever had an occasion to give an individual a gaze nystagmus test and then run that individual on the intoxilyzer?
>
> A Yes, sir.
>
> Q What correlation, if any, do you notice between the gaze nystagmus test and the results that you have received from the intoxilyzer machine?
>
> A After, after doing a number of gaze nystagmus, you can pretty well tell by the gaze

nystagmus what they're going to blow on the machine.

¶14. The horizontal gaze nystagmus (HGN) test has been used in the United States for over 30 years. John P. Ludington, Annotation, *Horizontal Gaze Nystagmus Test: Use in Impaired Driving Prosecution*, 60 A.L.R. 4th 1129 (1988). In the early 1960's, California police officers noticed that users of barbiturates eyes' moved in jerky motions when the test was applied. *Id.* at 1131. By the 1980's, this test was used throughout the nation, primarily as a means of finding probable cause to arrest. *Id.* HGN has "been held to be a 'search' within the meaning of the Fourth Amendment, but not to require probable cause to search, so that the application of the test is justified by a police officer's reasonable suspicion, based on specific, articulable facts, that the driver is intoxicated. *Id.* at 1132.

¶15. An HGN test is conducted by asking the driver to "cover one eye and focus the other on an object - usually a pen - held by the officer at the driver's eye level. As the officer moves the object gradually out of the driver's field of vision he watches the driver's eyeball to detect involuntary jerking. *Id.* The officer then observes: "(1) the inability of each eye to track movement smoothly; (2) pronounced nystagmus at maximum deviation; and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point." *Id.*

¶16. This Court has not directly dealt with the validity of the horizontal gaze nystagmus test as a method of determining intoxication. The Alabama Supreme Court in *Malone v. City of Silverhill*, 575 So. 2d 106 (Ala. 1990) stated "[t]he problem created by the improper admission of the HGN evidence is due to the scientific nature of the test and the disproportionate impact it might have had on the jury's decision-making process. . . . a jury 'might give undue weight to [HGN] evidence since it may appear to lend the certainty of an exact discipline to problematic fact finding.'" *Malone,* 575 So. 2d at 106. Furthermore, the Alabama Supreme Court found that improper introduction of the results of the HGN was reversible error. *Malone*, 575 So. 2d at 106.

¶17. Tennessee's Supreme Court has not yet reached a decision on the admissibility of the HGN test; however, in a series of unreported cases their appellate courts have found that "[a]fter careful review of the two alternative positions,[3] we believe that the better course is to hold that the underlying premise behind the HGN test is grounded in science, not in common knowledge of lay persons. . . ." *State v. Murphy*, 1995 WL 594715 (Tenn. Crim.App. 1995)(currently on appeal before the Tennessee Supreme Court).[4]

¶18. Arkansas has reached a vastly different conclusion. In *Whitson v. State*, 863 S.W.2d 794 (Ark. 1993), the HGN test was:

> not used to quantify a precise percentage of blood alcohol content but rather to show some indication of alcohol consumption in conjunction with other field sobriety tests. Using the test to identify a precise blood alcohol content under § 5-65-103 (b) is vastly different from testing to indicate some alcohol in the system for purposes of intoxication under § 5-65-103 (a).[5]

*Whitson*, 863 S.W.2d at 797. The Arkansas Court pointed out that other states have questioned the wisdom of allowing officers to testify to the correlation between HGN results and precise blood alcohol content. *Id. See, e.g. State v. Superior Court of County of Cochise*, 718 P.2d 171, 60 A.L.R.4th 1103 (Ariz. 1986). The Arkansas Court pointed out that the Arizona Court "drew a clear distinction between 1) using nystagmus to prove a percentage of blood alcohol content . . . and 2)

using it to prove driving under the influence . . . ." *Whitson*, 863 S.W.2d at 797. Arkansas, therefore, allows the admission of an officer's administration of HGN tests to prove intoxication, but not to prove blood alcohol content. *Id.* at 798.

¶19. We find that the HGN test is a scientific test. The potential of a juror placing undue weight upon testimony about the administration of the test is high. Whereas most other field sobriety tests arise out of a juror's common experiences, i.e., one stumbles, slurs words, and staggers when drunk, the HGN test relies upon a scientifically or at least professionally relevant set of observations.

¶20. Therefore, this Court finds that the HGN test is not generally accepted within the scientific community and cannot be used as scientific evidence to prove intoxication or as a mere showing of impairment.

¶21. However, the HGN test can still be used to prove probable cause to arrest and administer the intoxilyzer or blood test. This is the only allowable use for the test results. As stated in *Cole v. State*, 493 So. 2d 1333 (Miss. 1986);

> A search made without warrant and not incident to a lawful arrest is not illegal per se, but if the fruits of the search are to withstand the exclusionary rule, the search must have been predicated on probable cause. *Hailes v. State*, 268 So. 2d 345, 346 (Miss. 1972). The existence of probable cause and the determination of whether there has been a violation of the constitutional protection against unreasonable search and seizure is determined on a case by case basis. *Penick v. State*, 440 So. 2d 547 (Miss. 1983).

*Cole*, 493 So. 2d at 1335. Since the HGN test can only be used to show probable cause, the test results should only be presented to the trial court at a probable cause hearing. Therefore, the test results are not admissible before the jury. This is of extreme import due the high degree of likelihood that the jury would confuse the proper weight to be given the test results.

¶22. We deliver a stern warning concerning using the HGN test for reasons other than to establish probable cause. The State cannot use the results of the HGN test merely as an indicator to show that the defendant was "under the influence of intoxicating liquor" to prove the requisite elements of **Miss. Code Ann.** § 63-11-30 (1)(a). Furthermore, the State cannot attempt to introduce the HGN test as scientific evidence to show degree of intoxication.

¶23. Other evidence in this case overwhelmingly proves the State's case against Young. Therefore, we find the use of the HGN test in this case to be harmless error. However, in future cases, this Court will not allow the use of the HGN test as an indicator of impairment or as a specific measure showing intoxication.

### 3. Whether reversible error occurred when evidence regarding the intoxilyzer results was admitted at trial?

¶24. Young asserts that the best evidence rule requires the State to provide the actual test cards used in the calibration of the intoxilyzer, rather than allowing the testimony of the individual who conducted the calibration. The State refutes asserting that since the officer who conducted the tests was present and available for full cross-examination, the best evidence rule does not apply.

Furthermore, the State asserts that the requirements of **Miss. Code Ann.** § 63-11-19 (1996) (requiring proof of calibration) were substantially complied with as required by *Fulton v. City of Starkville*, 645 So. 2d 910, 913 (Miss. 1994).

¶25. **Miss. Code Ann.** § 63-11-19 (1996) establishes specific requirements upon the methods of testing, the qualifications of those who give the tests, and the calibration of the intoxilyzer, and states as follows;

> A chemical analysis of the person's breath, blood or urine, to be considered valid under the provisions of this section, shall have been performed according to methods approved by the State Crime Laboratory created pursuant to Section 45-1-17 and the Commissioner of Public Safety and performed by an individual possessing a valid permit issued by the State Crime Laboratory for making such analysis. . . .

> The State Crime Laboratory shall make periodic, but not less frequently than quarterly, tests of the methods, machines or devices used in making chemical analysis of a person's breath as shall be necessary to ensure the accuracy thereof, and **shall issue its certificate to verify the accuracy of the same.**

**Miss. Code Ann.** § 63-11-19 (1996)(emphasis added). This Court has addressed the admissibility of the intoxilyzer in *Bearden v. State*, 662 So. 2d 620 (Miss. 1995) and *Fulton v. City of Starkville*, 645 So. 2d 910 (Miss. 1994). The test is admissible as long as the State "substantially complies" with the requirements of the statute. *Fulton*, 645 So. 2d at 913. However, Young focuses not upon substantial compliance, but rather upon the evidentiary requirements of admission of the evidence.

¶26. **Miss. Code Ann.** § 63-11-19 (1996) requires the state to verify the accuracy of the intoxilyzer once every three months. At trial, the State presented the testimony of the officer responsible for the calibration of the Lincoln County machine. Prior to trial, Young had a subpoena duces tecum issued to the highway patrol for the production of the actual calibration cards used in verifying the calibration of the Lincoln County machine. As per state policy, the calibration cards had been disposed of by the verifying officer. Young asserts that the calibration cards are the best evidence of the calibration of the machine, and without the actual cards, the State could not adequately prove the accuracy of the machine.

¶27. In *Johnston v. State,* 567 So. 2d 237, 239 (Miss. 1990), the State could not provide a certification that the machine had been calibrated within the required 120 days. *Johnston*, 567 So. 2d at 239. The testimony of the Trooper who administered the test was found insufficient under the best evidence rule. *Id.* This Court apparently desired the production of a certificate showing that the machine had been calibrated within the required time requirement. *Id.*

¶28. Even though the production of the actual calibration cards used in testing the intoxilyzer would be an excellent method of proving the calibration of the machine, it would be an onerous burden upon the state. **Miss. Code Ann.** § 63-11-19 requires only a "Certification" of the calibration check of the machine. Therefore, to certify the accuracy of the intoxilyzer, the State must present the testimony and allow cross-examination of the calibrating officer along with the records of the results of the tests performed.

¶29. Furthermore, the best evidence rule is inapplicable in this case. "The best evidence rule only expresses a preference for original documents, but does not preclude the admission of secondary evidence." *Watson v. State*, 465 So. 2d 1091, 1092 (Miss. 1985). However, in the absence of the original document, the loss or destruction of the original must be explained. In the case *sub judice*, the State effectively shows that the results of the actual test were effectively recorded in the log book. Therefore, secondary evidence supplied through the log book and the testimony of the testing officer are adequate to prove the certification of the intoxilyzer.

## CONCLUSION

¶30. The trial court properly allowed conviction under both portions of the D.U.I. statute. Like Alabama and Arkansas, our statute simply enounce's different ways one can commit the same offense.

¶31. The trial court's abuse of discretion in the admission of the officer's testimony concerning the administration of the horizontal gaze nystagmus (HGN) test was error. This State does not recognize the use of the HGN test as evidence of impairment or intoxication. The test is allowable to show probable cause. However, due to the overwhelming evidence presented by the State to prove the intoxication of Young, this error was harmless.

¶32. Finally, no error occurred below in the State's proof of calibration of the intoxilyzer. The State complied with the requirements of the statute.

**¶33. CONVICTION OF CARELESS DRIVING AND DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR AND SENTENCE OF FORTY-EIGHT (48) HOURS IN JAIL WHICH MAY BE SUBSTITUTED FOR COMMUNITY SERVICE WORK AND PAYMENT OF AN $800 FINE FOR D.U.I., A $75 FINE FOR CARELESS DRIVING, COURT COSTS AND HIS DRIVERS LICENSE SUSPENDED AFFIRMED.**

**LEE, C.J., PRATHER, P.J., BANKS, ROBERTS AND SMITH, JJ., CONCUR. PITTMAN, J., CONCURS IN RESULT ONLY. SULLIVAN, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN AND McRAE, JJ. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH A SEPARATE WRITTEN OPINION.**

**SULLIVAN, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶34. I respectfully dissent with the majority's analysis of issue I concluding the Miss. Code Ann. Section 63-11-30(1) sets forth numerous methods of committing the same crime. A strict interpretation of 63-11-30(1) lists five separate crimes which are defended in different ways.

¶35. According to the majority's analysis, the five subsections of 63-11-30(1) are read as

conjunctive/disjunctive such that a person may be convicted by one or more of the listed subsections. However, the strict and literal meaning of 63-11-30(1) lists five separate crimes which are defended in different ways. The subsections (a) - (e) are separated by a disjunctive "or". Therefore, a person is guilty of unlawfully operating a vehicle if s/he: a)is under the influence of intoxicating liquor, b) under the influence of another substance impairing the ability to operate a vehicle, c) has a blood alcohol content above .10 percent if at least twenty-one, d) under the influence of an illegal controlled drug, *or* e) an alcohol concentration of .04 percent measured *etc*. If the legislature meant that a person may be convicted for more than one of the listed crimes, then the legislature would have included "and/" before "or".

¶36. The distinction between "common law" DUI and DUI per se was made in *Hendrick v. State*, 637 So.2d 834 (Miss. 1994). In interpreting 63-11-30(1) and (4) in attempt to analyze whether Hendrick violated 63-11-30(4) for purposes of the felony when one kills or maims a victim while violating 63-11-30(1), *Hendrick* stated that the elements are "operating a vehicle under the influence of intoxicating liquor, *or* operating a vehicle with ten one-hundredths percent or more ...." *Hendrick*, 637 So.2d at 837. *See also* **Fisher v. State**, 587 So.2d 888 (Miss. 1991). By definition, the two subsections of 63-11-30(1) pertaining to common law DUI and per se DUI require different standards for determining a violation of the separate crime:

> [I]t is the opinion of this office that the first block, charging DUI under Sec. 63-11-30(1)(a), should be checked by the officer either when test results are not available or the results that are available show a BAC [blood alcohol content] of less than .10%, and when the officer has probable cause to believe that the person is driving or operating a vehicle under circumstances indicating that his ability to so drive or operate the vehicle has been impaired by the ingestion of intoxicating liquor. The third block, charging an offense under Sec. 63-11-30(1)(c), should be checked when test results are available and are sufficient to give the officer probable cause to believe that the person is driving or operating a vehicle with a BAC of .10% or more.

*DUI Traffic Citation*, Op. Att'y Gen. (Jan. 6, 1987). Thus, the Attorney General specifically distinguishes between common law DUI and per se DUI. Specifically, 63-11-30(1)(c) is designated for persons testing above .10 percent blood alcohol content; 63-11-30(1)(a) is either for persons not tested or for persons not registering above .10 percent blood alcohol level.

¶37. Young contends that allowing the State to prosecute under both DUI offenses prejudiced his ability to defend since each offense required different proof. Namely, in order to prove the common law DUI, the State must prove that a driver was under the influence by evidence of his ability to operate a vehicle as well as observations of the arresting officer after the driver has been stopped. In order to prove a per se DUI, the State must merely show that the driver's alcohol content was above .10 percent while operating the vehicle and that the testing procedures were appropriate. Thus Young contends that allowing the state to prove both offenses allows the State to use evidence not necessary in one offense to prove the other.

¶38. While I do not believe that Young was so prejudiced as to reverse his case, I believe that the State should prosecute a driver under one offense or the other. In arresting a driver for a per se DUI, the police must have probable cause when they pull a driver over and demand that a breathalyzer test be taken. Probable cause is similar to some of the elements in the common law DUI. It stands to

reason then, that when a driver registers above .10 percent blood alcohol content, the state should elect to prosecute under 63-11-30(1)(c). Similarly, where a test was not taken, the state should prosecute under 63-11-30(1)(a). Therefore, until the legislature amends the statute otherwise, a proper interpretation of 63-11-30(1) sets forth five separate offenses.

**PITTMAN AND McRAE, JJ., JOIN THIS OPINION.**

### McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶**39.** I disagree with the conclusion reached in Issue 3 that the testimony of the officer who last conducted the calibration test on the intoxilyzer coupled with the log book certifying that it had been calibrated within the past 120 days is sufficient evidence that the machine was properly calibrated. The best evidence to prove the accuracy of the machines would be the actual calibration cards. Absent any actual evidence of the machine's accuracy, the confrontation rights of an individual charged with DUI are seriously abridged. Accordingly, I dissent from that part of the opinion.

¶40. Because our DUI statues create a presumption of intoxication based on an intoxilyzer reading, the machine and the results it produces are extremely important. Whether the machine is properly calibrated, therefore, is critical to an individual's case. An officer's recollection that a machine was properly calibrated when he tested it provides no meaningful opportunity for confrontation. To the contrary, the actual calibration cards - - and not just the log book indicating that the machine was tested on a given date - - would be the better evidence.

¶41. The intoxilyzer is a delicate instrument, akin to a computer. If not properly calibrated, the results it produces will be skewed. To require maintenance of the actual calibration cards would not, as the majority suggests, place an onerous burden on the State. There are not that many machines and they are only checked four times a year. While keeping the cards would go beyond the requirement of Miss. Code Ann. § 63-11-19 that only certification records be kept, it would go along way to preserving our due process rights. Young's intoxilyzer reading of .285 would require a Herculean consumption effort to produce, especially in light of the other facts of the case, calling into question the accuracy of the machine's calibration. His expert indicated that to register a blood alcohol level of that magnitude an hour after an individual stopped drinking would require that he consume seventeen beers within the two hours prior to the test. Thus, Young would have had to have consumed seventeen beers in an hour while he was driving north from Hammond to Richland rather than the six to eight beers that he testified that he had had over the course of the day. Perhaps the calibration was off. Especially where, as in the case *sub judice,* the test results are so inconsistent with the other evidence, the officer's testimony and a record indicating only *when* the intoxilyzer last was calibrated simply is not good enough. Accordingly, I disagree with the majority's conclusions in Issue 3 and would reverse on this issue.

1. This statute has been amended numerous times since the 1993 arrest. However, the relevant portions of **Miss. Code Ann.** § 63-11-30(1)(a) and (1)(c) have not changed.

2. This test is hereinafter referred to as the *Frye / Polk* test.

3. The Tennessee Court of Criminal Appeals cited the following cases finding HGN to not be a scientific test. *See, e.g., Whitson v. State,* 863 S.W. 2d 794, 798 (Ark. 1993); *State v. Murphy*, 451N.W. 2d 154, 157 (Iowa 1990); *State v. Garris*, 603 So. 2d 277, 282 (La. Ct. App. 1992); *State v. Nagel*, 506 N.E. 2d 285, 286 (Ohio 1986); *State v. Klawitter*, 518 N.W. 2d (Minn. 1994); *State v. Sullivan*, 426 S.E.2d 766, 769 (S.C.1993).

However, as stated by the Tennessee Court, "[a]nother line of cases, indeed the majority of jurisdictions which have addressed this issue, holds that the HGN test and results therefrom are scientific for the purposes of *Frye*." *See, e.g., Malone v. City of Silverhill*, 575 So. 2d 101, 105 (Ala.Crim.App.1989); *State v. Superior Court*, 718 P.2d at 179-181; *People v. Leahy*, 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321, 333-34 (Cal.1994); *State v. Garrett*, 119 Idaho 878, 811 P.2d 488, 490 (1991); *People v. Vega*, 145 Ill.App.3d 996, 99 Ill.Dec. 808, 496 N.E.2d 501, 504-05 (1986); *State v. Witte*, 836 P.2d at 1115-16; *State v. Wheeler*, 764 S.W.2d 523, 524-25 (Mo.App.1989); *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551, 559 (1986); *People v. Torrey*, 144 A.D.2d 865, 534, N.Y.S.2d 807, 809 (1988); *State v. Reed*, 83 Or.App. 451, 732 P.2d 66, 68 (1987); *Commonwealth v. Miller*, 367 Pa.Super. 359, 532 A.2d 1186, 1188 (1987); *State v. Cissne*, 72 Wash.App. 677, 865 P.2d 564, 568 (1994); *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642, 645 (1988).

4. Cases heard by the Tennessee Court of Criminal Appeals which are pending Supreme Court review are not published; however, Tenn. Rules of Crim. App. Proc. allow unpublished opinions to be cited in court if copies of opinions are given to the court.

5. The Arkansas statute is constructed similarly to the Mississippi D.U.I. law.